STANLEY AND PHYLLIS LEVINE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Levine v. Commissioner
Docket No. 34405-87
United States Tax Court
T.C. Memo 1995-362; 1995 Tax Ct. Memo LEXIS 360; 70 T.C.M. (CCH) 283; August 2, 1995, Filed *360 Decision will be entered for respondent. For petitioners: Gino Pulito. For respondent: John Aletta. ARMEN
ARMEN
MEMORANDUM FINDINGS OF FACT AND OPINION ARMEN, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b) and Rules 180 et seq. [1]
Respondent determined deficiencies in, and additions to, petitioners' Federal income taxes for taxable years 1980, 1981, and 1983 as follows: Additions to Tax
Sec.
Sec.
Sec.
6653
6653
Sec.
Sec.
Year
Deficiency
6653(a)
(a)(1)
(a)(2)
6659(a) 6661(a) 1980
$ 13,135
$ 656.75
--  --
$ 3,940.50
--  1981
773
--  $  38.65
[1] --  --  1983
13,011
--  650.55
[1] 1,977.60
[2] $ 1,604.75
*361 Respondent also determined that petitioners are liable for the increased rate of interest under section 6621(c), formerly section 6621(d), for the taxable years 1980 and 1983. Petitioners have conceded the deficiencies in income taxes. Accordingly, the only issues for decision are whether petitioners are liable for: (1) Additions to tax for negligence under sections 6653(a), 6653(a)(1), and 6653(a)(2); (2) additions to tax under section 6659(a) for a valuation overstatement for 1980 and 1983; (3) an addition to tax for a substantial understatement of income tax under section 6661(a) for 1983; and (4) the increased rate of interest under section 6621(c) for 1980 and 1983. FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. At the time that the petition was filed, petitioners resided in Elyria, Ohio. Petitioner Stanley Levine (petitioner) is a high school graduate, and also completed 1 year of college. Petitioner Phyllis Levine (Mrs. Levine) is a college graduate, and also earned a post-graduate degree in education. During the years in issue, petitioner was employed as a supervisor in an air traffic control center. During the years in issue, Mrs. Levine *362 was a high school English teacher who taught high school classes on an irregular basis. Petitioner has never had any specialized training in engineering. He also has never had any specialized training in accounting or taxation. However, prior to 1983, he generally completed petitioners' own income tax returns without professional assistance. Petitioner began investing [2] in 1980. Prior to 1983, he invested in rental properties. He considers those investments to have been successful and profitable, although they resulted in tax losses. Petitioner also invested through stockbrokers. In or about 1981, petitioner began considering other investment options. In an effort to evaluate his options, petitioner attended some seminars, met with two financial planners, and spoke with some colleagues. He recognized that to "get involved with [investing] without having expert knowledge would have been very foolish". Through *363 his professional colleagues, petitioner learned of Graham & Associates, Inc. (Graham & Associates). Before meeting with Thomas Graham (Graham), the president of Graham & Associates, petitioner determined that Graham was from a town nearby and was well known in the community. Petitioner's first meeting (the first meeting) with Graham and his brother John Graham was at the offices of Graham & Associates. Mrs. Levine did not attend the first meeting. Petitioner was impressed by the offices and observed that Graham & Associates "had a staff of people who looked to [petitioner] to be pretty knowledgeable". Petitioner was also impressed by the explanation offered by Graham & Associates as to the financial planning services they offered. After petitioner and Mrs. Levine discussed engaging Graham & Associates as their financial planner, petitioners attended a follow-up meeting (the follow-up meeting) with Graham & Associates. At the follow-up meeting, attended by Graham and his brother John Graham, petitioners were told about the Saxon Energy Corp. (Saxon). Petitioners first learned of Saxon through Graham & Associates. Saxon was a corporation formed in 1981 to lease energy management *364 systems to the public. See , affd. per order (discussing the Saxon Energy program in some detail). Petitioners had no experience or knowledge with respect to the acquisition, lease, production, installation, marketing, or use of energy management systems during the taxable years in issue. No individual associated with Graham & Associates was an expert in energy management systems, nor was petitioner under the impression that he was receiving the advice of any individual with any expertise in energy management systems. Graham & Associates provided petitioners with several documents relating to Saxon, including a copy of the Saxon Energy Corp. Energy Brain/Fuel Optimiser Equipment Leasing Program Information Memorandum (the Information Memorandum) and a document entitled "Frequently Asked Questions About the Energy Brain/Fuel Optimiser Equipment Leasing Program". These documents contained limited information regarding the energy management systems and a comparatively extensive amount of information regarding the potentially favorable tax consequences of *365 leasing such a system. An Agreement of Lease (the lease) dated December 7, 1983, and signed on December 31, 1983, was entered into by petitioners as lessees and Saxon as lessor. The lease involved an interest in an Energy Brain/Fuel Optimiser System A-1 (the Energy Brain System), an energy management device. The term of the lease was 20 years. Petitioners did not see any appraisal of the Energy Brain System prior to entering into the lease agreement. Moreover, petitioners did not negotiate the amount of the lease payment to Saxon, and they have never seen the Energy Brain System that they leased from Saxon. Under the terms of the lease, petitioners were required to pay, and did in fact pay, an advanced guaranteed rental for the period December 31, 1983 through December 31, 1984 in the amount of $ 13,500 for their interest in the Energy Brain System. After petitioners made this payment, petitioners and a Saxon representative executed an Election to Pass Investment Tax Credits from Lessor to Lessee. Petitioners never intended to use the Energy Brain System themselves. Instead, petitioners planned to engage a management company, which would locate an end-user. The end-user would *366 pay for the Energy Brain System by sharing equally the amount of energy savings with petitioners. The management company was to retain a fee of 15 percent of petitioners' share of the energy savings and remit the balance to petitioners. Petitioners were then required to pay Saxon 75 percent of the remaining net income. Petitioners entered into a management agreement (the management agreement), dated December 7, 1983, with ALH Energy Management Corp. (ALH) as the management company for the Energy Brain System. Petitioners relied upon Saxon to select ALH as the management company. By letter dated June 22, 1984, K.M. Fereg (Fereg) of ALH notified petitioners that the Energy Brain System had been placed in service in December 1983. The location of the Energy Brain System was identified in that letter as the Pot Belly Pub/Blisard Mckinley Tavern in West Hempstead, New York. A $ 150 check from petitioners to ALH for insurance was returned to petitioners by ALH. Petitioners made no other payments for insurance. A Certificate of Insurance for the Energy Brain System named Saxon as the insured. The policy expiration date was December 1, 1984. After entering into the lease, communications *367 between petitioner and Graham regarding petitioners' investment in the Energy Brain System related primarily to concerns about the viability of the investment as a tax shelter. Susan Haselhorst (Ms. Haselhorst) is an expert in the fields of energy management systems, design engineering evaluation methods, and energy system modeling. She prepared a study for respondent entitled "An Assessment of the Fair Market Value and the Profit Potential of the Energy Brain 1983A, 1 through 4" (the Study). The preparation of the Study took 120 hours and utilized four experts who hold degrees in areas such as engineering and accounting. The cost of conducting the Study was approximately $ 15,000. In evaluating the fair market value and the profit potential of the Energy Brain System, Ms. Haselhorst considered, among other things, the Information Memorandum and other promotional literature, the terms of the lease entered into by petitioners and Saxon, and publicly available trade catalogues and magazines. She also had an opportunity to examine an Energy Brain/Fuel Optimiser System A-1, as well as energy management systems being marketed by other companies. On the basis of the Study, Ms. Haselhorst *368 concluded that the fair market value of the Energy Brain System did not exceed $ 795. She also concluded, on the basis of the Study, that over a 10-year period an individual leasing the Energy Brain System would incur an economic loss of $ 50,000. Petitioners do not dispute these conclusions. We think the conclusions are supportable and adopt them as our own. See . During 1982 and 1983, there were many products comparable to the Energy Brain System being marketed due to the nation's energy conservation needs. Energy management systems were available at the retail level for prices ranging from a few hundred dollars to hundreds of thousands of dollars. The variation in prices of energy management systems was the result of differences in the number of functions controlled by each such system. For example, a more elaborate system would control heating, air conditioning, lighting, and ventilation. Such a system would likely also serve other purposes, such as security, fire protection, and various monitoring functions. The Energy Brain System controlled only heating, a fact that was indicated in the Information *369 Memorandum. Accordingly, it would properly have been considered a relatively low-end model. Petitioners timely filed their income tax returns for the taxable years 1980, 1981, and 1983. Petitioners attached to their 1983 income tax return, which was prepared by Graham, Form 3468 (Computation of Investment Credit). On that form, petitioners reported a value of $ 205,000 for their interest in the Energy Brain System. On the basis of that valuation, petitioners claimed an investment credit in the amount of $ 20,500. [3]
Petitioners also attached a Schedule C in respect of their Saxon investment to their 1983 return. On the Schedule C, petitioners claimed as deductions a number of expenses, including lease expenses of $ 13,500, management fees of $ 1,260, other fees of $ 1,060, and legal and professional services of $ 665. Petitioners *370 reported no gross receipts or sales in respect of their Saxon investment on the Schedule C. On Form 1045, Application for Tentative Refund, filed with respondent, petitioners claimed investment credit carrybacks pertaining to their Saxon investment to the taxable years 1980 and 1981. Investment credit carrybacks in the amount of $ 13,135 and $ 773, respectively, were tentatively allowed. [4]
As previously indicated, petitioners concede the deficiencies in income taxes. We need therefore only decide whether petitioners are liable for: (1) Additions to tax for negligence; (2) additions to tax for a valuation overstatement for 1980 and 1983; (3) an addition to tax for a substantial understatement of income tax for 1983; and (4) the increased rate of interest under section 6621(c) *371 for 1980 and 1983. OPINION Petitioners bear the burden of proof as to each of the additions to tax and the increased rate of interest. Rule 142(a); . Negligence
We begin with the additions to tax for negligence, the primary issue in this case. Section 6653(a) for 1980 and section 6653(a)(1) for 1981 and 1983 impose an addition to tax if any portion of an underpayment is due to negligence or intentional disregard of the rules or regulations. For 1981 and 1983, section 6653(a)(2) imposes an addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. . In order to prevail on the issue of negligence, petitioners are obliged to prove that their actions in connection with the Saxon transaction were reasonable in light of their experience and the nature of the investment. See . *372 Within this framework, petitioners may prevail if they reasonably relied on competent professional advice. . However, "Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered." , affd. , affd. . When considering the negligence addition, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers as well as the manner in which the taxpayers approached their investment. In this case, petitioners contend that their actions, particularly their reliance on Graham & Associates, were reasonable. Petitioners cite , revg. , as authority for their position that their actions were reasonable. Petitioners' reliance on , is misplaced, as petitioners' *373 circumstances are quite different than those of the taxpayers in the Heasley case. The taxpayers in Heasley had only high school degrees and extremely limited investment experience. Moreover, the Court of Appeals for the Fifth Circuit indicated that the taxpayers in Heasley both intended to earn an economic profit on the investments in issue and actively monitored that investment. By contrast, although petitioner has completed only 1 year of college, Mrs. Levine earned not only a bachelor of science degree, but also a post-graduate degree in education. Mrs. Levine's apparently limited involvement in petitioners' investment activities does not minimize this distinction in educational backgrounds. Also, in marked contrast to the taxpayers in Heasley, petitioners had a certain amount of investment experience. Specifically, they had previously invested through stockbrokers and had invested in rental properties. With regard to their investments in rental properties, it is significant to note that petitioner viewed those investments as profitable despite the fact that petitioners incurred tax losses with respect to them. Accordingly, it is clear that by the time he met *374 Graham, petitioner already understood, and had personal experience with, the concept of sheltering income, particularly since he prepared petitioners' income tax returns for years before 1983. Further distinctions between petitioners and the taxpayers in Heasley exist. We are not persuaded that petitioners intended to profit economically from their investment in the Energy Brain System, particularly in light of the fact that petitioners did not see any appraisal of the Energy Brain System before entering into a lease agreement. [5] Moreover, we cannot conclude that petitioners' post-investment communications regarding the Energy Brain System constituted efforts to monitor petitioners' investment. Rather, on the basis of the facts presented at trial, we find that these post-investment contacts related to the ongoing investigation by the Internal Revenue Service (IRS) of Saxon and of those who invested in Saxon promotions. *375 There are other indications in the record that petitioners' actions with respect to the investment in the Energy Brain System were not reasonable under the circumstances. Petitioner testified that to "get involved with [investing] without having expert knowledge would have been very foolish". Yet, before choosing to rely on Graham's investment advice, petitioner knew only that several of his colleagues had invested with Graham & Associates, that Graham was from a town nearby and was well known in the community, and that Graham "had a staff of people who looked to [petitioner] to be pretty knowledgeable". Petitioners made almost no effort to ascertain the expertise of Graham & Associates as a firm or the reliability of the investment advice provided to them by Graham & Associates with respect to the Energy Brain System. Even though petitioners did not investigate Graham's credentials, they were aware that neither he nor any of his associates had any expertise in energy management systems. Petitioners have failed to persuade us that their actions in connection with their investment in the Energy Brain System were reasonable in light of their experience and the nature of their investment. *376 Accordingly, we sustain respondent's determination with respect to the imposition of additions to tax for negligence. Valuation Overstatement
We turn now to the addition to tax for a valuation overstatement. Such an addition to tax may be imposed if an underpayment of tax attributable to a valuation overstatement equals or exceeds $ 1,000. Sec. 6659(a), (d). A valuation overstatement exists if the value of any property or the adjusted basis of any property claimed on a return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis. Sec. 6659(c)(1). In the event that the reported value exceeds 250 percent of the correct value, an addition to tax of 30 percent of the underpayment of tax attributable to such overstatement is imposed. Sec. 6659(b). Section 6659 does not apply, however, to underpayments of tax which are not attributable to valuation overstatements. , affg. (where taxpayers were not entitled to claimed investment tax credits because property was not placed in service during the years *377 in issue, the underpayment was not attributable to a valuation overstatement). Respondent determined that petitioners are liable for additions to tax for a valuation overstatement for the taxable years 1980 and 1983. On their 1983 income tax return, petitioners claimed a value of $ 205,000 for their interest in the Energy Brain System. On the basis of that valuation, petitioners claimed an investment tax credit of $ 20,500 and utilized $ 9,135 of that amount to reduce their reported income tax liability (exclusive of the alternative minimum tax) for 1983 to zero. They also claimed as deductions a number of expenses relating to the Saxon investment, including lease expenses of $ 13,500, management fees of $ 1,260, other fees of $ 1,060, and legal and professional services of $ 665. On Form 1045, Application for Tentative Refund, filed with respondent, petitioners claimed investment credit carrybacks pertaining to their Saxon investment to the taxable years 1980 and 1981, and such credits were tentatively allowed in the amounts of $ 13,135 and $ 773, respectively. On the basis of the Study, we have concluded that the fair market value of the Energy Brain System did not exceed $ 795. *378 Therefore, petitioners' valuation of the Energy Brain System constitutes a valuation overstatement. We must now decide whether the deficiencies in income taxes for 1980 and 1983 are attributable to such overstatement. See, e.g., , affg. ; , affg. ; . [6]
In this instance, the deficiency determined by respondent for 1980 resulted from the *379 disallowed carryback of investment credit from 1983 pertaining to petitioners' Saxon investment. Accordingly, we sustain respondent's application of the addition to tax under section 6659(a) to the entire underpayment for the taxable year 1980. We also sustain respondent's determination with respect to that part of the underpayment for the taxable year 1983 that is attributable to the valuation overstatement, specifically the amount relating to the investment tax credit. Because petitioners reported and paid alternative minimum tax due on their original 1983 income tax return, the amount attributable to the valuation overstatement in 1983 is $ 6,592, rather than $ 9,135. The balance of the underpayment is attributable to the disallowed Schedule C expenses relating to petitioners' Saxon investment, and, as respondent correctly determined, such balance is not attributable to the valuation overstatement. Substantial Understatement
We turn next to the addition to tax for substantial understatement of income tax under section 6661(a) for 1983. Section 6661(a) imposes an addition to tax equal to 25 percent of the amount attributable to a substantial understatement. [7] An understatement *380 is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1). [8]
The addition to tax under section 6661(a) applies in this case because the amount of the understatement for 1983 is in excess of $ 5,000, which is in excess of 10 percent of the tax required to be shown on the return. However, the addition to tax applies only to the amount of the underpayment not attributable *381 to the overvaluation of the Energy Brain System. Sec. 6661(b)(3). Such underpayment amounts to $ 6,419, as respondent correctly determined. [9]
Increased Rate of Interest
Finally, section 6621(c) provides for an increased rate of interest with respect to any underpayment in excess of $ 1,000 which is "attributable to one or more tax-motivated transactions". Sec. 6621(c)(1) and (2). The increased rate of interest applies to interest accruing after December 31, 1984. See , affd. (the increased rate of interest applies to interest accruing after December 31, 1984, even though the transaction in question was entered into before the date of enactment of section 6621(c)). Respondent determined that petitioner was liable for the increased rate *382 of interest because the underpayments for the taxable years 1980 and 1983 are attributable to tax-motivated transactions. Section 6621(c)(3)(A)(i) provides that the term "tax-motivated transaction" includes "any valuation overstatement (within the meaning of section 6659(c))". Accordingly, in light of our conclusion that a valuation overstatement exists for 1980 and 1983, we are bound to sustain respondent's determination under section 6621(c) with respect to the deficiency in each of those years that relates to the valuation overstatement. In addition, section 6621(c)(3)(A)(v) also provides that the term tax-motivated transaction includes "any sham or fraudulent transaction". Economic shams, or transactions which lack economic substance, fall within the ambit of section 6621(c)(3)(A)(v). , affd. without published opinion , affd. sub nom. , affd. sub nom. , affd. without published *383 opinion sub nom. . Petitioners introduced no evidence that the Saxon transaction was not an economic sham. Accordingly, we sustain respondent's determination that petitioners are liable for the increased rate of interest under section 6621(c) with respect to the deficiencies for 1980 and 1983. Conclusion
In order to reflect our disposition of the disputed issues, as well as petitioners' concessions, Decision will be entered for respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the statutory interest due on the amount of the deficiency attributable to negligence, i.e., $ 773 for 1981 and $ 13,011 for 1983.↩
2. Respondent amended her answer to plead, in the alternative, that in the event that the Court concludes that the addition to tax under section 6659(a) does not apply, the addition to tax under section 6661(a) should be increased to 25 percent of the entire deficiency, rather than 25 percent of the portion of the deficiency not attributable to an overvaluation of property.↩
2. Throughout this Opinion, we use the term "invest" and its derivatives solely for the sake of convenience.↩
3. Of this amount, petitioners utilized $ 9,135 on their 1983 return in order to reduce their reported income tax liability (exclusive of the alternative minimum tax) for that year to zero.↩
4. The sum of these two amounts equals $ 13,908. Petitioners computed this number as follows: ↩
1983 investment credit
$ 20,500
Less: amount claimed in 1983
-9,135
Balance
11,365
Plus: 1983 AMT
2,543
Unused ITC for carryback
13,908
5. We note that petitioner's testimony was not always consistent with the facts stipulated by the parties. For example, petitioner testified at trial that he had received "information with regard to the appraisal of the unit" in advance of petitioners' investment in Saxon. However, the parties stipulated that petitioners did not see any appraisal of the Energy Brain System prior to entering into the lease agreement.↩
6. Sec. 6659 applies to returns filed after Dec. 31, 1981. When an item carried back from a later year (such as 1983) to an earlier year (such as 1980) is "attributable to" the adjustments in the later year, sec. 6659 may be applied to taxable years prior to 1981. .↩
7. Having concluded that petitioners are subject to the addition to tax for a valuation overstatement under sec. 6659(a), we need not address respondent's alternative argument, advanced in her amended answer, that sec. 6661(a) should apply to the entire deficiency for 1983.↩
8. An understatement will be reduced to the extent that it is: (1) Based on substantial authority or (2) adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2)(B). In this case, the understatement for 1983 was neither based upon substantial authority nor adequately disclosed.↩
9. ↩
I.e., total underpayment of tax
$ 13,011
Less: underpayment attributable
-6,592
to valuation overstatement
Balance
6,419