T.C. Memo. 1995-539

UNITED STATES TAX COURT

GUY SCHOENECKER, INC., BUSINESS INCENTIVES, INC.,
AND CAROUSEL BY GUY, INC., Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 11462-93, 1268-94.      Filed November 14, 1995.

<u>James E. O'Brien</u> and <u>Wayne A. Hergott</u>, for petitioners in docket Nos. 11462-93 and 1268-94.

<u>Steven Z. Kaplan</u>, for petitioners in docket No. 11462-93.

<u>Genelle F. Forsberg</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SCOTT, <u>Judge</u>: Respondent determined deficiencies in the consolidated income tax of Guy Schoenecker, Inc., and its two subsidiaries for the years and in the amounts as follows:

| Fiscal year ended | Deficiency |
| --- | --- |
| June 30, 1988 | $254,535 |
| June 30, 1989 | 587,024 |
| June 30, 1990 | 1,305,103 |
| June 30, 1991 | 82,587 |

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the

Tax Court Rules of Practice and Procedure, unless otherwise indicated.

Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision whether the deduction claimed by Guy Schoenecker, Inc., and subsidiaries (petitioner) for compensation to Guy Schoenecker (Mr. Schoenecker) exceeds reasonable compensation for services rendered by Mr. Schoenecker and, if so, the proper deduction for compensation to Mr. Schoenecker in each of the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Guy Schoenecker, Inc. (hereinafter GSI), is a corporation formed on November 9, 1978, with its principal place of business in Minneapolis, Minnesota. During the years here in issue 99 percent of the stock of GSI was owned by Mr. Schoenecker and certain family trusts, and 1 percent was owned by his son, Larry Schoenecker (Larry). GSI owns and has owned since its inception 100 percent of the stock of Business Incentives, Inc. (BI). GSI also owns and has owned since its inception 100 percent of the stock of Carousel By Guy, Inc. (formerly Animal Fair, Inc., and hereinafter referred to as Animal Fair). GSI and its subsidiaries kept their books and reported their income on an

accrual basis for the fiscal years ending June 30 for the years here in issue. In 1981 the fiscal yearend was changed from March 31 to June 30.

GSI, BI, and Animal Fair filed a consolidated Federal income tax return for each of the fiscal years ended June 30, 1988, 1989, 1990, and 1991.

Mr. Schoenecker was born on September 22, 1927. In 1950 Mr. Schoenecker and Mr. Robert MacDonald (Mr. MacDonald) incorporated BI. From the time of its incorporation until 1979, Mr. Schoenecker and Mr. MacDonald each owned 50 percent of the stock of BI.

In 1960 Mr. MacDonald had a driving accident and became a paraplegic. He returned to work for BI on a part-time basis in 1963, and in 1979 he retired as an officer and director of BI because of his health, but remained as a consultant of BI until 1988. On January 12, 1979, Mr. MacDonald sold his 50-percent of the common stock in BI to GSI for $3,079,925. The terms and conditions of the stock purchase by GSI from Mr. MacDonald were incorporated in an agreement. The purchase of the 353 shares originally owned by Mr. MacDonald included 17 shares which Mr. MacDonald had given to a charity, which shares were purchased by GSI at the same time and at the same price per share as the shares which at that time were owned by Mr. MacDonald. Under the provisions of the stock purchase agreement, GSI paid $175,000 in

cash to Mr. MacDonald and executed a promissory note to him in the aggregate principal amount of $2,756,600.  Installment payments of $58,915 principal, plus accrued interest, were to be made on April 5, June 5, September 5, and December 5 of each year, plus $200,000 principal was due on January 15, 1980, and January 15, 1981.  The promissory note was due and payable in full by December 5, 1988.

After the incorporation of GSI and its purchase of Mr. MacDonald's stock, the following dividends were declared by BI and paid in cash to GSI by BI:

| Fiscal year | Dividends declared | Amount paid |
|---|---|---|
| 3/31/79 | $310,640 | $310,640 |
| 3/31/80 | 524,888 | 524,888 |
| 3/31/81 | 489,426 | 489,426 |
| 6/30/81[1] | 169,440 | 169,440 |
| 1982 | 1,613,012 | 1,613,012 |
| 1983 | 204,740 | 204,740 |
| 1984 | 420,070 | 420,070 |
| 1985 | 388,300 | 388,300 |
| 1986 | 76,248 | 76,248 |
| 1987 | 105,900 | 105,900 |
| 1988 | 0 | 0 |
| 1989 | 0 | 0 |
| 1990 | 5,000,002 | 5,000,002 |
| 1991 | 0 | 0 |

[1] Short period due to change in fiscal year.

In addition, in 1990, BI transferred improved real estate having a value of approximately $2,700,000 to GSI as a dividend. Dividend payments in 1988 and prior years were used by GSI to pay Mr. MacDonald.  The 1990 real estate dividend was paid as a

result of advice received by Mr. Schoenecker that restructuring of BI to transfer the real estate it owned to Mr. Schoenecker was advisable.

From the time of its incorporation in 1978, no dividends were declared by GSI until its fiscal year 1990. On May 18, 1990, GSI transferred and paid dividends in cash to Larry of $85,097.96 and to Mr. Schoenecker of $4,915,899.25, and transferred real estate located at 7625 Bush Lake Road valued at $1,950,000 to Mr. Schoenecker and real estate located at 7630 Bush Lake Road valued at $2,400,000 to Mr. Schoenecker. The real estate transferred by GSI to Mr. Schoenecker was the property in which the business offices of GSI and BI were located. The cash dividend from GSI to Mr. Schoenecker was paid out of cash dividends from BI to GSI and enabled Mr. Schoenecker to have readily available funds with which to pay the taxes resulting from the dividend paid to him in real estate.

BI is engaged, and has been since its incorporation, in the business of business incentive awards, which awards are primarily merchandise and travel given by the clients of BI to their customers in return for stamps or certificates and as promotions by BI's clients. Approximately 60 percent of the revenues of BI in 1990 came from its incentive awards activities. However, BI is also engaged in communication, media, direct mail, print, theater, and video work, and approximately 16 percent of its

revenues in 1990 were derived from these activities.  It also is engaged in training of employees of BI's clients, and from this activity derived approximately 10 percent of its revenues in 1990.  BI was also engaged in measurement of the efforts by the client firms to satisfy their customers, and approximately 15 percent of its revenues in 1990 came from this activity.  BI was not engaged in the business of advertising or placing for clients advertisements in newspapers, in magazines, on television, or on radio.  Advertising agencies were not primary competitors of BI.

In connection with its incentives award and travel program, BI arranges for the certificates or the stamps for the clients, arranges the availability of the merchandise or the travel, and generally handles the work in connection with the program.  BI attempts to have a 50-percent markup on merchandise used to redeem certificates, but this target is not often received on large volume.  BI also attempts to make a profit by obtaining a discount on the travel provided for certificates.  In addition, it very often receives the normal travel commission for transportation and hotel sales.

Mr. Schoenecker grew up in a small town in rural Minnesota. He attended the University of St. Thomas in St. Paul, Minnesota, where he received a degree in political science in 1949.  He then attended the University of Minnesota Law School for a time. While still in college, Mr. Schoenecker became interested and

involved in the business of selling diamonds as engagement gifts to other college students.  Following his formal schooling, Mr. Schoenecker decided to join forces with Mr. MacDonald and, as a result of their agreement, BI's predecessor was incorporated in 1950.  In the early days of its operation BI sold various items such as diamonds, dishes, and sporting goods, but it soon developed and began the incentives promotion business. Initially, BI's clients were merchants, service stations, banks, and other businesses which were mostly local and relatively small.  Variations of these programs were the primary aspect of BI's business until approximately 1970 when it began to expand into the other areas discussed above.  BI's business steadily grew during the first 25 years of its existence.  Sales grew from approximately $313,000 in 1953 to $11,926,000 in 1974.  The aspects of BI's business, other than incentive awards, developed by Mr. Schoenecker in 1979, were geared toward selling incentive programs to large businesses.  In 1990, BI had 19 sales offices throughout the country.  It had 80 sales employees, of whom 60 were account executives and 20 managers.  The account executives reported to field sales managers, who reported to one of three area regional vice presidents, who reported to the senior vice president of sales and marketing of BI, Mr. William Shaw (Mr. Shaw).

The sales, other income which was principally interest income, total revenues, and net income before taxes, of BI for book purposes for its fiscal years 1981 through 1991 were as follows:

|  | Sales | Other income | Revenues | Net income before taxes |
|---|---|---|---|---|
| 3/31/81 | $39,213,635 | $857,938 | -- | $1,929,356 |
| 6/30/81 | 9,781,114 | 290,969 | $10,072,083 | 600,972 |
| 6/30/82 | 38,857,285 | 923,654 | 39,780,939 | 599,321 |
| 6/30/83 | 35,347,336 | 513,695 | 35,861,031 | (1,564,606) |
| 6/30/84 | 65,700,275 | 702,776 | 66,403,051 | 2,409,636 |
| 6/30/85 | 72,255,521 | 764,275 | 73,019,796 | (50,720) |
| 6/30/86 | 81,916,703 | 829,481 | 82,746,184 | 1,752,870 |
| 6/30/87 | 94,305,548 | 962,317 | 95,267,865 | 4,098,466 |
| 6/30/88 | 112,993,217 | 1,725,585 | 114,718,802 | 6,871,287 |
| 6/30/89 | 143,612,396 | 4,476,187 | 147,088,583 | 9,650,154 |
| 6/30/90 | 159,302,147 | 2,822,959 | 162,125,106 | 11,430,723 |
| 6/30/91 | 149,671,091 | 2,045,944 | 151,717,035 | 2,805,387 |

On April 1, 1974, BI and Mr. Schoenecker entered into a written employment agreement whereby BI employed Mr. Schoenecker as its president and chief executive officer (CEO). Mr. MacDonald signed the agreement on behalf of BI. At the time the employment agreement was entered into, Mr. MacDonald was the vice president and a director of BI, as well as a 50-percent stockholder. The employment agreement provided that Mr. Schoenecker would act as BI's president and CEO, and that he would devote his attention and best skills and energies toward the profit, benefit, and advantage of BI. The employment agreement provided for BI to pay Mr. Schoenecker a base salary of $9,000 a month ($108,000 per year) and an annual bonus of 8

percent of the net profits of BI and its subsidiaries before taxes.  Mr. Schoenecker was 46 years old when the employment agreement was entered into.  The employment agreement contained no provision for long-term incentives or retirement benefits.

The following table shows the book income before taxes for GSI and its subsidiaries taken from GSI's financial statements. Also included is the net income before taxes for GSI, which is income before taxes adjusted for losses or income from discontinued operations.

| FY ended | Net income before taxes of GSI & subsidiaries | Income before taxes GSI & subsidiaries |
|---|---|---|
| June 30, 1988 | $4,302,286 | $5,748,557 |
| June 30, 1989 | 9,725,667 | 9,759,287 |
| June 30, 1990 | 11,111,080 | 11,111,080 |
| June 30, 1991 | 3,224,665 | 2,237,628 |

BI's transition from providing services only to local merchants, service stations, and banks, to serving some large companies was gradual.  During the years here involved and for some years prior to those here involved, BI would design and sell integrated performance improvement programs involving numerous types of services and products designed to meet the specific needs of its clients.  BI's clients for these services have included such companies as AT&T, Cadillac, GTE, Quaker Oats, and IBM.  Not all of these clients, after engaging the services of

BI, have remained with it, since BI is in competition with other companies engaged in a similar business.  Mr. Schoenecker has personally directed efforts toward the securing of large companies as clients of BI, and through his efforts and personal discussions with the officers of some of these companies, many of BI's clients have been obtained.

The employment agreement between BI and Mr. Schoenecker was ratified by unanimous action of the directors of BI dated January 3, 1976.  At that time, the directors were Mr. Schoenecker, Mr. MacDonald, and Mr. James E. O'Brien, an attorney.

Up through its fiscal year ended March 31, 1979, Mr. Schoenecker's base salary remained at $108,000 a year, but starting in its fiscal year ended March 31, 1980, after the purchase by GSI of Mr. MacDonald's stock, his base salary began to increase.  Mr. Schoenecker's base salary was $400,000 for BI's fiscal year ended June 30, 1988, and $500,000 for each of BI's fiscal years ended June 30, 1989, 1990, and 1991.

There are no corporate minutes or similar documents relating to the salary of Mr. Schoenecker and his bonus for BI's fiscal years 1988 and 1989.  The bonus for BI's fiscal year 1988 was computed at 10 percent of net book income of BI before taxes, and for its fiscal year 1989 it was computed at 12 percent of the net book income of BI before taxes.  By action of the sole director

of BI dated June 19, 1991, Mr. Schoenecker's annual base salary of $500,000, and a bonus equal to 12 percent of corporate net income before taxes of GSI and subsidiaries, was ratified for the prior year, the fiscal year 1990. Corporate net income was defined as net income of GSI and subsidiaries before income taxes and before Mr. Schoenecker's bonus. By action of the sole director of BI dated June 19, 1991, Mr. Schoenecker's annual base salary of $500,000 and a bonus equal to 12 percent of corporate net income before taxes of GSI and subsidiaries was ratified for its fiscal year 1991. Corporate net income was defined in the same way as it was defined for BI's fiscal year 1990. For BI's fiscal years here in issue, 1988 through 1991, Mr. Schoenecker's bonus was computed as a percentage of the book income before taxes of BI, and not the book income of GSI and subsidiaries, which for each of these years was less than the book income of BI. In some years prior to those here in issue Animal Fair had profits, and, in those years, book income of GSI and subsidiaries would for that reason have been greater than book income of BI alone.

Mr. Schoenecker participated in all employee fringe benefits of BI in the same manner as all employees of the corporation. During the years here in issue BI had a section 401(k) plan, a group health insurance plan, and a group life insurance plan in which Mr. Schoenecker participated. BI paid a portion of Mr.

Schoenecker's health insurance premiums and the full premium for Mr. Schoenecker's life insurance. The section 401(k) plan of BI was adopted July 1, 1984, and provided for salary reduction contributions by persons covered by the plan of a minimum of 1 percent to a maximum of 13 percent of certified earnings.

Animal Fair was acquired by BI in 1965. The corporate and business names were changed to Carousel By Guy, Inc., in 1989. In its fiscal year 1991 a large portion of the assets of Animal Fair, including its name, was sold. The corporate name was then changed back to Animal Fair, Inc. Originally Animal Fair manufactured and sold stuffed animals. Animal Fair, after its acquisition by BI, expanded to three divisions: a toy division, a gift division, and a premium division. In its fiscal year 1988 the toy division of Animal Fair was liquidated, and in its fiscal year 1991 the gift division was sold. Animal Fair paid compensation to Mr. Schoenecker for each of its fiscal years 1988, 1989, and 1990 of $100,000. For its fiscal year 1991, compensation of $100,000 was awarded to Mr. Schoenecker, but was not paid until after June 30, 1991. Mr. James Kelly was paid $90,000 by Animal Fair for its fiscal year 1988, $110,000 for its fiscal year 1989, $122,500 for its fiscal year 1990, and $215,000 for its fiscal year 1991. For its fiscal year 1988 Animal Fair paid Mr. Richard Duff $103,750 and Mr. Dean Fitch $156,922 for service for three-quarters of the year, and Mr. William Jeurgens

$122,047.  For its fiscal year 1989 Animal Fair paid Mr. Richard Duff $137,500 and for its fiscal year 1990 paid him $157,000. Mr. Duff was paid $34,692 for a part of Animal Fair's fiscal year 1991.  Mr. Schoenecker's son Larry was paid $50,000 by Animal Fair for its fiscal year 1990 and $150,000 for its fiscal year 1991.

Other senior executives of BI were paid on a basis of a base salary plus a bonus, which was generally computed on a percentage of either sales, or income, or both, above specified amounts. For its 4 fiscal years involved in this case, the total salary and bonus of the five highest paid employees of BI, other than Mr. Schoenecker, were as follows:

| FY-88 | Position | Salary | Bonus | Total |
|---|---|---|---|---|
| William Shaw | V.P. Sales & Marketing | $85,000 | $196,889 | $281,889 |
| Jim Dinwoodie | St. Acct. Exec. (Dallas) | 30,000 | 184,849 | 214,849 |
| Jim Discher | Sr. Acct. Exec. (Detroit) | 25,000 | 213,426 | 238,426 |
| William Shumate | V.P. Travel | 110,000 | 92,500 | 202,500 |
| Earl Nelson | V.P. Travel | 110,000 | 92,500 | 202,500 |

| FY-89 | | | | |
|---|---|---|---|---|
| William Shaw | V.P. Sales & Marketing | 85,000 | 651,997 | 736,997 |
| Jim Discher | Sr. Acct. Exec. | 25,000 | 370,643 | 395,643 |
| Roger Ackley | Sales V.P.-East | 65,000 | 323,824 | 388,824 |
| Edward Thompson | Regional V.P. | 55,000 | 304,614 | 359,614 |
| Terry Winzeler | Sales V.P.-West | 55,000 | 289,402 | 344,402 |

| FY-90 | | | | |
|---|---|---|---|---|
| Terry Winzeler | Sales V.P.-West | 65,000 | 327,500 | 392,500 |
| James McGivern | Reg. Sales Mgr. | 25,000 | 299,500 | 324,500 |
| David Terry | Sales V.P.-Central | 55,000 | 217,100 | 272,100 |
| William Shaw | V.P. Sales & Marketing | 85,000 | 172,100 | 257,100 |
| Jim Morrissey | Sales Manager (Chicago) | 55,000 | 200,300 | 255,300 |

FY-91

| | | | | |
|---|---|---|---|---|
| James McGivern | Reg. Sales Manager | 40,000 | 122,100 | 262,100 |
| Wayne Heus | Sales Manager (Indianapolis) | 40,000 | 212,400 | 252,400 |
| William Shaw | V.P. Sales & Marketing | 85,000 | 155,000 | 240,000 |
| Robert Van Buskirk | Sr. Account Exec. (Dallas) | 50,000 | 176,200 | 226,200 |
| Larry | V.P. Merchandise | 150,000 | 70,000 | 220,000 |

Mr. Shaw's employment agreement with BI provided for a bonus composed of five elements, including sales, contributions to profits, and performance based on both sales and contributions to profits. For BI's fiscal years 1990 and 1991, Mr. Shaw's stated sales plan (the amount required before a bonus applied) was increased over the prior year and the fixed bonus for achieving the stated sales plan was decreased from the prior year. For 1990 and 1991 the stated contributions to the profits plan amount before application of a bonus were increased over the prior years, and the fixed bonus for achieving the stated contributions to profits plan was decreased in amount. The performance bonus was also changed to include 11 levels in BI's fiscal year 1990 and 10 levels in BI's fiscal year 1991, as opposed to 6 levels in 1989, and had a cap placed on it for BI's fiscal years 1990 and 1991, less than the cap in 1989. Each of the other five top paid

officers had bonuses computed on amounts above a certain level, somewhat comparable, but not identical or equal in amount to the bonus arrangement with Mr. Shaw. There were employees other than the five highest paid employees for the years here in issue, who were compensated by BI with a fixed salary, plus a bonus related to sales or profits or both.

During the years here in issue BI had an excellent management team which was experienced, capable, and had long service with BI. As of 1990 the various vice presidents of BI had been employed by BI for periods of time ranging from 11 to 36 years. The average length of employment was more than 17 years. However, Mr. Schoenecker was the key man of the organization as its CEO. As CEO, Mr. Schoenecker's duties included building the purpose and mission of BI, integration of quality strategies with the business strategies, signing contracts of over 1 year's duration, involvement in changes in the organizational structure, working with the handbook, and meeting and greeting customers, which involved considerable travel. As CEO, Mr. Schoenecker had the overall responsibility for the operations and policies of BI. Mr. Schoenecker uses a hands-on type of management. He interviews all account executives hired by BI. He has client contact, particularly with the high-ranking executives of BI's clients. He customarily works 60 to 70 hours per week.

BI's two major competitors are Maritz, Inc. (Maritz), headquartered in St. Louis, Missouri, and Carlson Marketing, also known as E.F. MacDonald (hereinafter referred to as MacDonald) headquartered in Minneapolis, Minnesota. In addition to its two major competitors, BI has a number of other competitors. Maritz was organized in 1923 and is sometimes referred to as the grandfather of the incentive industry. According to a Dunn & Bradstreet Corp. report the business of Maritz consists of: (1) Providing employee-motivation programs through merchandise and travel incentives (48 percent of its revenue); (2) arranging and providing travel tour services on a corporate and business group level (34 percent of its revenue); (3) providing data communication services and audio-visual production for business meetings (9 percent of its revenue); and (4) providing marketing research and analysis services (9 percent of its revenue). Maritz, in its fiscal year ended March 31, 1989, according to the Dunn & Bradstreet report, generated revenue in excess of $1 billion, and net income of $38.5 million. According to Dunn & Bradstreet, Maritz employs approximately 5,000 individuals in various capacities, has 200 offices in 35 states, and has international offices in England; Mexico City, Acapulco, Cancun, Mexico; and Montego Bay, Jamaica.

MacDonald was incorporated in 1960 as Premium Corp. of America and Grand Union Corp. In 1969 the company was acquired by Carlson Companies and operated as a subsidiary of that

organization.  According to Dunn & Bradstreet, MacDonald had assets of $347 million with stockholder's equity of $208 million as of December 31, 1988.  Management of BI estimated that in the late 1980's MacDonald generated yearly revenues of approximately $325 million.

The following is a summary of a survey by the Executive Compensation Service (ECS) of top executive compensation of CEO's by industry categories as of May 1990, showing results for the year 1989 classified under all industries and categories of industries for companies that had sales of approximately $162 million:

| Title | Year | Sales | Average | +1 SD | +2 SDs |
|-------|------|-------|---------|-------|--------|
| All Industries | | | | | |
| CEO | 1989 | $162.416 | $340.72 | $497.96 | $655.21 |
| All Manufacturing | | | | | |
| CEO | 1989 | 162.416 | 345.71 | 505.38 | 665.04 |
| Durable Goods Manufacturing | | | | | |
| CEO | 1989 | 162.416 | 343.92 | 522.82 | 701.72 |
| Non-Durable Goods Manufacturing | | | | | |
| CEO | 1989 | 162.416 | 351.03 | 488.82 | 626.61 |
| All Non-Manufacturing | | | | | |
| CEO | 1989 | 162.416 | 343.83 | 488.25 | 632.67 |
| Wholesale Trade | | | | | |
| CEO | 1989 | 162.416 | 380.49 | 580.02 | 779.55 |
| Services | | | | | |
| CEO | 1989 | 162.416 | 362.71 | 508.11 | 653.51 |
| Business Services | | | | | |
| CEO | 1989 | 162.416 | 359.46 | 497.23 | 634.99 |

Sales are in millions, +1 SD is one standard deviation over the average, and +2 SDs is two standard deviations over the average.

The +1 SD and +2 SDs are adjustments to the average compensation by ECS for superior performance.  The ECS survey of top executives' compensation in the business services and wholesale trade industries for companies with sales in the range of $135 to $175 million showed the top compensation of any CEO to be $703,530 for 1988, $779,555 for 1989, $882,680 for 1990, and $838,970 for 1991.  The compensation shown in the ECS survey was total cash compensation, including salary, bonuses, and cash fringe benefits.

The following schedule shows information taken from proxies of the advertising agencies indicated with respect to revenues and net income before taxes for the years 1988, 1989, 1990, and 1991:

Proxy Analysis - Advertising Agency Profiles
(Data in thousands)

| Company | Revenue | | | | Net income before taxes | | | |
|---------|---------|---------|---------|---------|---------|---------|---------|---------|
| | 1988 | 1989 | 1990 | 1991 | 1988 | 1989 | 1990 | 1991 |
| Dimark, Inc. | $14,510 | $16,054 | $24,419 | $30,208 | $1,106 | $407 | $1,394 | $2,024 |
| Foote Cone & Belding Comm. | 386,050 | 326,075 | 338,138 | 341,987 | 21,203 | 32,857 | 34,402 | (16,509) |
| Grey Advertising, Inc. | 373,293 | 411,083 | 481,282 | 528,299 | 33,986 | 30,726 | 31,975 | 9,364 |
| Greenstone Roberts Adv. | 3,695 | 5,828 | 8,216 | 9,044 | 800 | 955 | 518 | 624 |
| Inter-public Group of Cos. | 1,152,870 | 1,218,141 | 1,329,488 | 1,634,670 | 132,570 | 143,614 | 155,625 | 187,486 |
| Laser Vision Centers, Inc. | N/A | N/A | 2,483 | 1,274 | N/A | N/A | (96) | (199) |
| Omnicom Group | 881,286 | 1,007,173 | 1,178,233 | 1,236,158 | 83,557 | 98,612 | 111,796 | 121,198 |

The following table shows the cash compensation paid to the CEO of each of the companies listed above for the years indicated:

Proxy Analysis - CEO Pay

Cash Compensation - Top Paid Individual

| Company | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|
| Dimark, Inc.[1] | N/A | N/A | N/A | $555,909 |
| Foote Cone & Belding | $540,000 | $715,000 | $715,000 | 615,000 |
| Grey Adv., Inc.[2] | 1,558,784 | 1,748,268 | 1,943,815 | 1,979,855 |
| Greenstone Roberts Adv.[3] | 305,000 | 250,000 | 377,051 | 367,000 |
| Interpublic Group of Cos.[4] | 1,652,525 | 1,705,044 | 1,635,232 | 1,437,983 |
| Laser Vision Centers, Inc. | N/A | N/A | N/A | 109,826 |
| Omnicom Group | 780,000 | 957,500 | 1,053,750 | 1,168,750 |
| 75th %tile Regression Est. | 965,600 | 964,800 | 1,106,100 | 955,700[5] |

[1] Employment contract (9/89) calls for base of $312,000 plus 15% of pretax earnings greater than $1,250,000.

[2] Employment agreement (2/84) calls for employment through 1990 with annual base of $1.3 million (1988); agreement amended to increase base pay to $1.5 million (1989) and $1.7 million (1990-1991).

[3] Employment agreement calls for base salary of $365,000 and bonus equal to 3% of EBIT (through 1994).

[4] Employment contract which, in 1992, calls for employment through 6/96 and base of $965,000.

[5] The 75th percentile regression estimate is a variation of "average".

The size of a company, the amount of its sales, and the volume of its sales have a definite effect on the compensation paid to the top executives.

The following schedule shows the base salary, bonus estimated and paid in the applicable year, and the earned bonus paid in the following year by BI to Mr. Schoenecker, and the amounts deducted on the corporate income tax return by BI as compensation to Mr. Schoenecker.

|  | FY-88 | FY-89 | FY-90 | FY-91 |
|---|---|---|---|---|
| Base salary | $400,000 | $500,000 | $500,000 | $500,000 |
| Bonus: Estimated and paid in the applicable year | 600,000 | 1,000,000 | 1,000,000 | 300,000 |
| Earned and paid in the following year | -- | 163,476 | 315,930 | 558,735 |
| Amount paid and deducted on corporate income tax return | 1,000,000 | 1,663,476 | 1,815,930 | 1,358,735 |

In addition, as heretofore stated, Mr. Schoenecker received $100,000 from Animal Fair in each of its fiscal years 1988, 1989, and 1990.

Respondent, in her notice of deficiency, determined that the proper allowable deductions for compensation to Mr. Schoenecker by petitioner were $354,000 for its fiscal year 1988, $380,000

for its fiscal year 1989, $296,816 for its fiscal year 1990, and $338,475 for its fiscal year 1991. Accordingly, respondent disallowed the balance of the compensation claimed to be deductible by GSI and subsidiaries for Mr. Schoenecker in each of these years.

OPINION

Section 162(a)(1) allows as a deduction a reasonable allowance for salaries or other compensation paid for personal services rendered. In order to be deductible, the amount must be paid for services rendered and not a substitute for dividends, and must be reasonable for the services rendered. Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 152 (8th Cir. 1974), affg. T.C. Memo. 1973-130. The Schneider case, citing Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), lists the following factors that are often considered in determining the reasonableness of compensation: (1) The employee's qualifications; (2) the nature, extent, and scope of the employee's work; (3) the size and complexities of the business; (4) a comparison of salaries paid with the employer's gross income and net income; (5) the prevailing general economic conditions; (6) a comparison of salaries with distributions to stockholders; (7) the prevailing rates of compensation for comparable positions in comparable concerns; (8) the salary policy of the taxpayer as to all employees; and (9) in the case of small corporations with a limited number of officers, the

amount of compensation paid to the particular employee in previous years. The Schneider case also quotes the provision of section 1.162-7(b)(2), Income Tax Regs., that while a fixed method of compensation is not decisive as to its deductibility, generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.

Petitioner in this case argues that Mr. Schoenecker had superior qualifications which would justify a high level of compensation. Petitioner contends that Mr. Schoenecker's education, which included a college degree and some study of law, his experience, motivation, leadership, managerial skills, business judgment, specialized training, personal contacts, and personal selling attributes, justify a high salary. We have concluded that Mr. Schoenecker was a very competent CEO and have given weight to this fact in our conclusion as to reasonable compensation for his services. However, limits to reasonable compensation exist, even for very valuable employees. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1325 (5th Cir. 1987), affg. T.C. Memo. 1985-267.

Petitioner next refers to the nature, extent, and scope of Mr. Schoenecker's work at BI. Petitioner states that it is no small task to be the person responsible for keeping over 750 employees, including such diverse groups as salespeople, creative personnel, and accounting personnel moving in the same direction. However, this is the normal expected job of a CEO, and though a lack of ability in that area might warrant less compensation, competence in that area is expected. Nevertheless, we consider Mr. Schoenecker to have been shown by this record to be a CEO who kept close tabs on the work of his organization in a very competent manner. Petitioner states that Mr. Schoenecker's duties included those of CEO, as well as chief operating officer, and chief quality officer. However, the record shows that there were a number of other competent employees in BI, and Mr. Schoenecker's work was primarily that of the CEO. Certainly as the CEO, he had general supervision and control over operations and quality of the work, but he did have other competent officers to perform the daily aspects of that work. Mr. Schoenecker, as CEO, had final responsibility of all aspects of BI's business. Mr. Schoenecker's devotion to the business is certainly unquestioned on this record. He had been with the company since its inception, and was the sole owner of the company during the years here in issue. The record shows he worked 60- to 70-hour weeks, but this again is not uncommon for a CEO, nor is it necessarily one of the prime criteria on which to judge the

competency and value to the company of a CEO.  It is the accomplishments of the executive and not necessarily the hours worked, although the working of long hours is to be considered. Again, petitioner cites the responsibility for BI's success and "irreplaceability" of Mr. Schoenecker.  While Mr. Schoenecker would certainly be a great loss to the company were he not there, it is fairly clear from this record that there are other competent officers of BI, such as Mr. Shaw and, during the latter years here in issue, Mr. Schoenecker's son Larry was taking more responsibility for the business.  However, the fact that there are other competent officers employed by BI does not detract from the fact that Mr. Schoenecker is a very competent CEO.

Petitioner points out that the growth, profitability, and financial condition of the business are important in determining whether compensation paid to an employee is reasonable.  Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1157-1158 (1980).  The record here shows that BI has grown substantially since its incorporation in 1950.  Certainly that growth is to an appreciable extent due to the work of Mr. Schoenecker.  However, unlike the situation in Home Interiors & Gifts, Inc. v. Commissioner, supra, the growth of BI was in line with that of BI's competitors.

Petitioner contends that an unrelated investor would be satisfied with the return on his investment in BI from the income of BI after the payment of Mr. Schoenecker's salary.  Respondent

contests this assertion and particularly the comparison petitioner's expert made to mutual fund returns.  It is difficult to determine what an independent investor would expect from the risk of his funds in a business such as BI's.  However, it is reasonable to assume that an independent investor would be unwilling for an officer to realize compensation out of line with compensation paid by similar businesses, thus unnecessarily reducing the income produced by the business in which he had invested.

Petitioner discusses the general economic conditions and the growth of the incentives industry in general, and contends that BI's growth was outstanding, even compared to the general economic conditions and the economic conditions in the incentives industry.  Unfortunately, the record has very little information with respect to other members of the incentives industry, which are petitioner's prime competitors.  The record has some indications that petitioner's growth did not exceed that of the incentives industry in general.  Petitioner's expert witness, Mr. Locke, indicated that information as to the salaries paid to the CEO by Maritz and MacDonald might be available to his firm, but he did not produce the information, even when it was suggested to him that it might be quite helpful.  The information that is in the record indicates that petitioner did not grow faster than its competitors and may have grown less fast than its prime competitor Maritz.

Finally, petitioner argues that Mr. Schoenecker's compensation was paid under a formula agreed to in 1974 in an arm's-length transaction. If this were the fact, it might have a bearing on the reasonableness of Mr. Schoenecker's compensation, although it would not be conclusive as to its reasonableness if the conditions in the company had changed. See Patton v. Commissioner, 168 F.2d 28 (6th Cir. 1948), affg. a Memorandum Opinion of this Court dated Apr. 30, 1947. However, here it is not at all clear that the agreement entered into in 1974, when petitioner was a 50-percent owner of BI, and because of an injury the other 50-percent owner-officer could work only part-time, was at arm's length. However, even if we assume that the agreement made in 1974 was an arm's-length agreement, Mr. Schoenecker's compensation for the years here in issue was not computed under this agreement. The 1974 agreement provided for $108,000 yearly base compensation and a bonus of 8 percent of net income of BI and subsidiaries before taxes. By 1988 the base compensation of Mr. Schoenecker had been upped to $400,000, and in 1989, 1990, and 1991 it was $500,000, and the bonus percentage had become 10 percent in 1988, and 12 percent in 1989, 1990, and 1991. The information to determine exactly the amount Mr. Schoenecker would have received in each of the years here in issue under the 1974 agreement is in this voluminous record and shows that applying the formula under the 1974 agreement, Mr. Schoenecker's salaries and bonuses would have been $567,884 for BI's fiscal year 1988,

$888,742 for BI's fiscal year 1989, $996,886.40 for BI's fiscal

year 1990, and $287,010 for BI's fiscal year 1991.  This

computation is as follows:

| FY ended | Income before taxes of GSI & subsidiaries | 8-percent of income before taxes | 8-percent of income before taxes + $108,000 |
|---|---|---|---|
| June 30, 1988 | $5,748,557 | $459,884.56 | $567,884.56 |
| June 30, 1989 | 9,759,287 | 780,742.96 | 888,742.96 |
| June 30, 1990 | 11,111,080 | 888,886.40 | 996,886.40 |
| June 30, 1991 | 2,237,628 | 179,010.24 | 287,010.24 |
| Total | 28,856,552 | 2,308,524.16 | 2,740,524.16 |

For the years 1990 and 1991 Mr. Schoenecker's bonuses were to

be computed on the income of GSI and its subsidiaries, but were,

in fact, computed on BI's income and, apparently, with some small

error even in that computation.  Since BI's income in the years

here in issue was in excess of that of GSI and its subsidiaries,

the bonuses were overstated under the compensation formula set

forth in the corporate minutes for BI's 1990 and 1991 years.  The

1974 agreement as to base compensation was honored through 1979,

while Mr. MacDonald was still a 50-percent stockholder of BI.

Once GSI acquired all of BI's stock, and Mr. Schoenecker, as the

sole stockholder of GSI was the owner of BI, the $108,000 began

to increase, and by the years here in issue it was greatly

increased.  This is an indication that Mr. Schoenecker, as sole

owner, fixed his own salary without real reference to the value

of his services to BI.  This is further demonstrated by the

difference in the formula for bonuses for other officers and for

Mr. Schoenecker and the fact that when the formula for Mr. Shaw's

bonuses resulted in a bonus which apparently Mr. Schoenecker considered too high in an uncommonly good year for BI, the formula was changed to reduce the bonus base.

Since a reasonable salary is one that would be agreed to in arm's-length negotiations, the amount paid for comparable work by comparable companies is a very important factor in determining reasonable compensation. In a competitive market for a CEO the going salary paid by a comparable business to a CEO would set a pattern for negotiations. Experts for each party testified in the case and used various statistics to support the opinions given. One of petitioner's experts, Mr. Locke, relied on materials from the advertising industry, which even he admitted were not representative of petitioner's business. We have set forth the statistics Mr. Locke used, since the figures themselves show that some of the companies were ten times the size of BI. Also, the record shows the businesses were different from and more complex than BI's business. The record is clear that the advertising companies are not a good comparison to BI. However, even the 75-percentile regression estimate of these advertising companies, which was used in effect as an average, was except for 1 year less than $1 million for the CEO, and in the 1 year just slightly over $1 million. In order to attempt to justify Mr. Schoenecker's salary, petitioner's expert made adjustments to the salaries paid to advertising executives for retirement and other fringe benefits. In our view, the testimony of Mr. Locke, based

on the statistics from the advertising field, is of little value. If any consideration were warranted of the salaries paid by advertising agencies, the payments by Grey Advertising, Inc., Interpublic Group of Companies, and the Omnicom Group, one of which had revenues of about three times that of BI, another of which had revenues of almost 10 times BI's, and the third about six times BI's revenues would have to be eliminated. The salaries paid to CEO's by the other advertising firms as shown in the proxies ranged from $250,000 to $715,000. None approached the salary including bonuses paid to Mr. Schoenecker by BI for any year here in issue.

The clear indication from the testimony of Mr. Locke is that he was aware of salaries paid by BI's direct competitors, Maritz and MacDonald, but would not disclose them.

Respondent's expert, Mr. Brennan, used the ECS statistics along with other information in his reports. Mr. Brennan's report was received in evidence as his opinion, and petitioners' counsel did not cross-examine him on the report.

Petitioner argues that the business services and wholesale trade from the ECS statistics primarily relied on by Mr. Brennan are not comparable to BI: (1) Because the area of business services and wholesale trade are not comparable to petitioner's business, and (2) because the officers in these companies may have received pensions and other benefits that Mr. Schoenecker did not get. It is reasonably clear that the compensation in the

ECS reports included all cash compensation paid to the CEO's. If some fringe benefits or contributions to a retirement plan were cash payments, this amount was included. Mr. Schoenecker had some fringe benefits. BI had a section 401(k) plan in which Mr. Schoenecker was entitled to participate, and Mr. Schoenecker had his life insurance premiums paid for him by BI, and a portion of his medical insurance premiums, just as other BI employees.

However, we do agree with petitioner that while the categories of business services and wholesale trade might include the type of business engaged in by petitioner, they are far too broad to be representative of petitioner's business.

While Mr. Brennan did not know the exact amount of the salary of the CEO of petitioner's main competitor, Maritz, he did have information from the company that it was less than the maximum range of companies its size in the ECS survey. Maritz was a much larger company than BI.

As petitioner points out, there is no way of knowing from the record the reason the CEO of Maritz had the salary he had without knowing more facts about how the salary was determined than this record shows. However, that is true of any determination based on statistics. The burden here is on petitioner to show error in respondent's determination. Petitioner has produced little evidence to show what a reasonable salary would be for Mr. Schoenecker in the years here in issue.

The record here shows no payments of dividends by BI, except to GSI to buy out Mr. MacDonald, until a rearrangement of financial affairs was made for BI, GSI, and Mr. Schoenecker in 1990 when it was determined to be advantageous to get real estate out of the ownership of BI or GSI. The real estate was declared as a dividend by BI to GSI and by GSI to Mr. Schoenecker, and a cash dividend was declared for Mr. Schoenecker to use to pay the taxes on the real estate dividend. The main business offices of BI were located on the real estate declared as a dividend to Mr. Schoenecker. Neither BI nor GSI had a regular dividend policy.

In evaluating Mr. Schoenecker's ability as a CEO, it should be noted that he was also the CEO of Animal Fair, which was not very successful in its operations.

From the record here, we conclude that Mr. Schoenecker set his salary in the years here involved on a basis to take out of the company as salary amounts he wished to withdraw from the company, and not on the basis of a reasonable salary which would have been paid in an arm's-length transaction.

This record is clearly inadequate to establish the amount of a reasonable salary for Mr. Schoenecker. However, there are indications that a reasonable salary for Mr. Schoenecker would be in excess of the amounts allowed by respondent in each of the years in issue. In fact, respondent in her brief requests as an ultimate finding of fact, that "Reasonable compensation for Guy [Mr. Schoenecker] as CEO was in the range of $354,920 to $415,100

for FY-88, $380,490 to $408,300 for FY-89, $422,500 to $460,690 for FY-90, and $435,060 to $483,200 for FY-91." The minimum of this range was in excess of the amount determined by respondent in the notice of deficiency to be reasonable compensation. Respondent, of course, based this requested finding on her interpretation of the evidence as a whole. However, a review of the report of respondent's expert witness, Mr. Brennan, indicates that the ranges probably came to an appreciable extent from his report. The ECS figures included in that report by Mr. Brennan contained, as we have stated, amounts of "maximum" amounts paid to CEO's of companies in business services and wholesale trade which receive revenues comparable to those received by GSI and subsidiaries in the years 1988 through 1991. Mr. Brennan's report stated that to justify a salary of this amount Mr. Schoenecker would have to be the outstanding executive in the entire country, which, in Mr. Brennan's opinion, the record did not support. It is not absolutely clear how the "maximum" amounts of compensation were computed in the ECS statistics. It does appear that this amount is basically the top salary paid to an executive of a company in the business services and wholesale trades industry, the revenues of which were comparable to those of BI. Although we recognize that the business services and wholesale trade industries are not good comparisons on an average basis to petitioner's more limited type of business, it appears to us that a reasonable salary for Mr. Schoenecker would not be

greater than the top salaries paid. If, in fact, petitioner had been among the companies included in the ECS report, the salary paid to Mr. Schoenecker would have been the top salary since it exceeded the top salary shown in the ECS report. However, BI and GSI were not public companies, the financial operations of which were available to ECS from published sources. It appears that neither BI nor GSI information was reported to ECS. Another difficulty with the ECS statistics is the difference in the number of companies included in different years. However, we have compared the figures of the top salaries in the business services and wholesale trade classification for the years 1988 through 1991 with the salaries paid by advertising firms that were close in size to BI. Overall the top salaries in the business services and wholesale trade classification are in excess of the salaries paid by advertising firms of the approximate size of BI. According to petitioner's witness, the salaries in the business services and wholesale trade industries did not include certain fringe benefits, such as retirement pay. However, there is nothing to show that in addition to the reported salaries, such fringe benefits were paid by the companies. The ECS figures of top pay in the business service and wholesale industry are also in total in excess of the amount of salary that would have been paid to Mr. Schoenecker under the 1974 agreement for the years here in issue. We are aware, of course, that under an arm's-length arrangement, the base salary

of Mr. Schoenecker would probably have been increased to some extent through the years. However, there is nothing to show that the percentage of income before taxes which Mr. Schoenecker was to receive would have been increased, and, in fact, if an unusually good year occurred, the percentage might have been decreased, as was the situation with Mr. Shaw after an unusually good year for BI. The top amounts paid or "maximum" amounts shown in the ECS survey exceed substantially the amounts determined under the formula for the fiscal years 1988 and 1991 in our computation of the amount that Mr. Schoenecker would have received under the 1974 agreement. For the fiscal years 1989 and 1990 the amounts computed under the formula are somewhat in excess of the amounts shown as the maximum amounts paid in the ECS survey. However, it was the results of the very high amount received by Mr. Shaw under his bonus plan in BI's fiscal year 1989 that caused the method of computing the bonus to be changed so that the amounts received by Mr. Shaw in fiscal years 1990 and 1991 were approximately back to the level of the amount he received in fiscal year 1988. It would, therefore, seem logical that had Mr. Schoenecker been negotiating compensation at arm's length, the amount resulting from the high income in the fiscal year 1989 would have caused some form of decrease in the percentage of income amount he would receive as a bonus in subsequent years. On an overall basis, it is more favorable to petitioner to use the amounts of the top pay as shown by the ECS

reports of CEO's of business services and wholesale companies receiving comparable revenues to those received by BI, than to use the amount computed under petitioner's 1974 salary agreement with BI. It is certainly more favorable than using the salary payments from advertising companies in the same general revenue receipt area as BI, unless they are to be substantially increased for items which it is not clear were not already included, or were benefits which were not part of the compensation of the officer involved. It is not unusual that higher cash compensation be paid to an officer who does not receive noncash benefits.

Therefore, considering this record as a whole, and being unwilling to sustain respondent's determination on the basis of failure of proof by petitioner, we conclude that the evidence most indicative of a proper amount to be paid to Mr. Schoenecker in each of the years here in issue from this record is the "maximum" amounts paid CEO's of companies in business services and wholesale trade that received revenues comparable to those received by GSI as shown by the ECS survey for the years 1988 through 1991. These amounts are $703,530 in BI's fiscal year 1988, $779,550 in BI's fiscal year 1989, $882,680 in BI's fiscal year 1990, and $838,970 in BI's fiscal year 1991. Therefore, based on this record as a whole, and considering the outstanding contribution Mr. Schoenecker made as CEO of BI, we hold that the above-set forth amounts constitute reasonable compensation to Mr.

Schoenecker for serving as CEO of BI in the fiscal years here involved and, therefore, hold that these amounts are the appropriate amounts of deductible compensation by petitioner for Mr. Schoenecker, rather than the amounts determined by respondent in the notice of deficiency.

<u>Decisions will be entered under Rule 155</u>.