T.C. Memo. 1996-32

UNITED STATES TAX COURT

ALONDRA INDUSTRIES, LIMITED,
d.b.a. ACCENT INSULATION COMPANY
AND SUBSIDIARIES, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 10849-91, 10851-91,    Filed January 29, 1996.
24777-92.

<u>Mark D. Pastor</u> and <u>Larry S. Dushkes</u>, for petitioners.

<u>Ursula P. Gee</u>, <u>William A. McCarthy</u>, and <u>Linette B. Angelastro</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>: By statutory notices dated March 8, 1991, respondent determined deficiencies in and additions to the

---

[1]Cases of the following petitioners are consolidated herewith: Edco Leasing Corporation, docket No. 10851-91; and Pertinax, Limited, docket No. 24777-92.

Federal corporation income tax of petitioner Alondra Industries, Limited, d.b.a. Accent Insulation Company (Alondra), for its fiscal year ended June 30, 1987 (Alondra's fiscal 1987), and of petitioner Edco Leasing Corporation (Edco) for its fiscal year ended September 30, 1987 (Edco's fiscal 1987).  By notice of final partnership administrative adjustment (FPAA) dated July 13, 1992, respondent increased the income reported on the U.S. Partnership Return of Income of petitioner Pertinax, Limited (Pertinax), a partnership whose partners include Alondra and Edco, for the calendar year 1987.  The deficiencies, additions, and adjustment in dispute are as follows:

ket No. 10849-91 (Alondra)

| Fiscal | | Additions to tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6661(a) |
| 1987 | $836,238 | $41,812 | 50% of the interest due on $836,238 | $209,060 |

Docket No. 10851-91 (Edco)

| Fiscal | | Additions to tax | |
|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) |
| 1987 | $21,814 | $1,091 | 50% of the interest due on $21,814 |

Docket No. 24777-92 (Pertinax)

| Calendar | |
|---|---|
| Year | Adjustment to Income |
| 1987 | $860,425 |

Petitioners' cases were consolidated for trial, briefing, and opinion.

The issues for decision are (1) whether the burden of proof should be shifted from corporate petitioners to respondent with respect to the issues of substantiation of claimed expenses for rent and management fees; (2) whether disputed amounts of $26,881, $3,721, and $3,136 allegedly paid respectively by Alondra, Edco, and Pertinax to Joel Munro (Mr. Munro) for rent are deductible by petitioners as ordinary and necessary business expenses; (3) whether and to what extent $1,000,112 paid to Mr. Munro is deductible by Pertinax as reasonable compensation; (4) whether disputed amounts of $906,879 and $9,922 allegedly paid respectively by Alondra and Edco to Pertinax as management fees are deductible by Alondra and Edco as reasonable compensation; (5) whether disputed amounts of $884,148 and $35,671 paid respectively by Alondra and Edco to Pertinax for wages paid to employees of Pertinax, some of whom also served as officers of Alondra and Edco, are deductible by Alondra and Edco as ordinary and necessary business expenses; (6) the proper tax treatment of unreasonable compensation routed to Mr. Munro by Alondra and Edco through Pertinax; and (7) whether Alondra and Edco are liable for additions to tax for negligence under section 6653(a)(1)(A) and (B)[2] and Alondra is liable to the addition to tax for substantial understatement under section 6661(a).

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

We hold that: (1) Corporate petitioners' motion to shift the burden of proof is denied as moot; (2) the disputed amounts allegedly paid for rent are not deductible; (3) the disputed amounts paid to Mr. Munro as compensation are deductible by Pertinax only to the extent stated below; (4) the disputed amounts allegedly paid by Alondra and Edco to Pertinax as management fees are not deductible; (5) the disputed amounts paid by Alondra and Edco to Pertinax for wages of its employees are deductible to the extent stated below; (6) the unreasonable compensation routed to Mr. Munro by Alondra and Edco through Pertinax should be treated as unreasonable compensation directly provided to Mr. Munro by Alondra and Edco; and (7) the additions to tax for negligence and for substantial understatement are both sustained to the extent stated below.

## FINDINGS OF FACT

The stipulations of fact, the supplemental stipulations of fact, and the exhibits attached thereto are incorporated in our findings by this reference. Unless we state otherwise, these findings concern facts occurring during the relevant taxable period.

### Parties and Affiliates

Alondra is a California corporation. Alondra keeps its books and reports its income using the accrual method of accounting on a fiscal year ending June 30. J.B. Ross, a.k.a. Jo Anne Munro (Ms. Ross), is Alondra's sole shareholder and

secretary.  At the time of filing of Alondra's petition, its principal place of business was at 1001 El Centro Street, South Pasadena, California (the El Centro property).

Edco is a California corporation.  Edco keeps its books and reports its income using the accrual method of accounting on a fiscal year ending September 30.  Mr. Munro, Ms. Ross's father, is Edco's sole shareholder.  At the time of filing of Edco's petition, its principal place of business was at the El Centro property.

United California Insulation Company (UCIC) is a wholly owned subsidiary of United California Industries, Inc. (UCII); both of them are California corporations, and their income, deductions, and credits are reported on consolidated corporation income tax returns.[3]  The principal place of business of both UCIC and UCII is at the El Centro property.  Mr. Munro is UCII's sole shareholder.  UCIC keeps its books and reports its income using the accrual method of accounting and a calendar year. Neither UCIC nor UCII is a petitioner in this Court.[4]

---

[3]According to UCII's consolidated return for 1987, UCIC was one of three subsidiaries of UCII, but was by far the dominant member, accounting for some 77 percent of the UCII affiliated group's total gross receipts.

[4]Respondent determined a deficiency and additions against UCII for 1987, employing adjustments to the income of UCII similar to those against Alondra and Edco for their fiscal 1987, but the deficiency and additions are not in dispute, having been settled administratively.  At some undetermined time after 1987 and before trial of the cases at hand, UCII and/or UCIC filed for
(continued...)

Pertinax was formed as a California general partnership in January 1978. Pertinax keeps its books and records and reports its income using the accrual method of accounting and a calendar year. At the time of filing of Pertinax's petition, its principal place of business was at the El Centro property. From the time of its formation through 1987, Pertinax always had three general partners that shared equally in income and made equal capital contributions, and those partners are Edco, Alondra, and UCIC.

All three petitioners--Alondra, Edco, and Pertinax--as well as UCIC and UCII, are controlled by Mr. Munro and his family. Mr. Munro's daughter Ms. Ross is the sole shareholder of Alondra. Mr. Munro is the sole shareholder of Edco and UCII. Thus, members of Mr. Munro's family directly or indirectly own all of Pertinax's partners. Pertinax manages Alondra, Edco, and UCIC, and Mr. Munro controls Pertinax's policies.

Business Background

Alondra and UCIC are insulation contractors, engaged primarily in the sale and installation of insulation material in buildings. Edco is engaged in leasing automobiles and trucks. Pertinax provides marketing, management, and administrative services to its partners.

---

[4](...continued)
bankruptcy.

Alondra employs between 175 and 200 persons. Edco has three employees. Pertinax employs approximately 6 executives (including Mr. Munro and Ms. Ross), 2 to 3 managers, a sales employee, and 20-plus clerical personnel as support staff.

In 1970, when Mr. Munro was in his midsixties, he had approximately 30 years of business experience in banking and finance that included employment with Security Bank, Security Pacific Bank, the Bank of Pasadena, and Wells Fargo Bank. He first became acquainted with UCIC while he was employed at Wells Fargo, when the then owner of UCIC asked him for advice. In September 1970, when Mr. Munro retired from Wells Fargo, UCIC hired him as an adviser. Later, about 1972, Mr. Munro acquired ownership of UCIC[5] and was its sole shareholder from about 1972 through 1987. In 1972, Alondra was a newly organized but inactive corporation, and UCIC did all the insulation work of the complex later made up of Alondra, UCIC, Edco, and Pertinax.

David Lee Clearman (Mr. Clearman) joined UCIC at Mr. Munro's invitation in spring 1975, working as assistant to the president. After some 2 years at UCIC, Mr. Clearman became president of Alondra, which was just then beginning active operations.

Prior to beginning employment with UCIC and its affiliates in 1975, Mr. Clearman worked for Wells Fargo Bank, where he had

---

[5]The record does not indicate whether UCII existed at that time or how and when UCIC became a wholly owned subsidiary of UCII.

started in 1957 and risen to the rank of vice president and branch manager. In March 1968, while he was assistant manager of the South Pasadena branch, Mr. Clearman first met Mr. Munro, who was manager of that branch. Mr. Clearman and Mr. Munro worked together at the South Pasadena branch for about a year and a half.

By about 1975, UCIC's trade debt with its primary insulation supplier, Owens-Corning Fiberglass, was delinquent. Because of Owens-Corning's importance to UCIC, UCIC could not remain in business unless it avoided default on this debt. Mr. Munro persuaded Owens-Corning to restructure the payment terms on the debt. Then, by reducing overhead, returning some leased equipment, and closing unprofitable branch locations, he cut UCIC's expenses and increased its cash-flow. In this and other ways, Mr. Munro succeeded in having the Owens-Corning trade debt repaid in full and in putting UCIC on a sound operating footing.

Mr. Munro was UCIC's and Alondra's primary spokesman for purchasing fiberglass insulation material and for negotiating prices and terms with Owens-Corning. This was because the president of Owens-Corning personally held him in high esteem. Whereas the industry payment term was generally 30 days, and 60 days for a large contractor, Owens-Corning's terms with Alondra and UCIC were 90 days with a 2-percent discount. Mr. Munro's good relations with Owens-Corning were a critical reason for Owens-Corning's granting such favorable terms. The 90-day-

payment terms allowed Alondra and UCIC to buy and warehouse the insulation, sell and install the product, and collect the sale price before being required to pay Owens-Corning.  Alondra and UCIC always took advantage of the discounts offered by Owens-Corning.  The Alondra-UCIC combination was Owens-Corning's largest customer, and Alondra and UCIC were given Owens-Corning's best prices and terms.

As a result of the policies set by Mr. Munro, UCIC--and later Alondra--came to have excellent reputations with suppliers like Owens-Corning and with their customers, the general building contractors.  Alondra and UCIC could sell at competitive prices, and general contractors could depend on the two companies to deliver and install the product in good time, pass the necessary inspections, and relieve the general contractors' concerns about the insulation work on their projects.  Alondra and UCIC did not require any outside borrowings through 1987.

In the late 1970's, building activity was increasing in California, but insulation contractors were restricted to limited amounts of fiberglass insulation material from the primary supplier of this material, Owens-Corning.  In response, Mr. Munro decided to supplement fiberglass insulation, which is in bat form, with blowing wool made of cellulose.  He acquired eight blowing trucks for UCIC and Alondra, as he correctly anticipated that the shortage of fiberglass insulation would last several years.  With the eight trucks, at first primarily UCIC, and later

Alondra, could and did take advantage of the housing boom just then starting. As a result, UCIC and Alondra were able to increase their sales. In its 1978 corporate income tax return, UCII reported gross receipts of $10,938,143.51, whereas the relevant returns for UCII, Alondra, and Edco for their 1987 taxable years reported combined gross receipts of $25,115,417.[6]

---

[6]The figures are not strictly comparable. The figures for Alondra and Edco are not available for the earlier year. While Alondra presumably had few or no sales in that year, Edco is known to have been in existence and to have had employees. Subtracting Edco's gross receipts of $670,771 from the total for 1986-87 reduces the total to $24,444,646.

These figures should be adjusted to account for inflation. The Consumer Price Index published by the Department of Labor is the measure of inflation that is used in several sections of the Code. Secs. 1(f)(3)-(5), 32(j), 41(e)(5)(C), 42(h)(6)(G), 63(c)(4), 68(b)(2), 132(f)(6), 135(b)(2)(B), 151(d)(4), 513(h)(2)(C), 4001(e)(2). In addition, it is the measure of inflation that courts often use where the measure is not specified by statute, e.g., for the purpose of computing legal costs awarded under the Equal Access to Justice Act or sec. 7430. Jones v. Espy, 10 F.3d 690, 692 (9th Cir. 1993); Harris v. Sullivan, 968 F.2d 263, 265 (2d Cir. 1992); Bode v. United States, 919 F.2d 1044, 1053 n.8 (5th Cir. 1991).

If we use the Consumer Price Index, $10,938,143.51 in 1978 amounts to $19,042,313.47 in 1987 dollars. The 1986-87 total of $24,444,646 represents only 28.37 percent growth over that figure. If we take compounding into account, this corresponds to annual growth of 2.8 percent if we consider the time until 1986-87 to be 9 years (3.2 percent if we use 8 years). If we use the Producer Price Index, we get similar figures: $16,516,711.96 in 1987 dollars; total growth of 48.00 percent, representing 4.45 percent annual growth over 9 years.

For comparison, Mr. Munro's compensation received from Pertinax rose from $216,955 in 1978 to $596,316 in 1986 and $1,000,112 in 1987. If we use the Consumer Price Index, $216,955 in 1978 amounts to $377,698.93 in 1987 dollars. The 1987 amount of $1,000,112 represents 164.79 percent growth over that figure.

(continued...)

Role of Alondra

Until the late 1970's, UCIC was the dominant member of this complex of organizations.  However, UCIC's installation workers were unionized, competitive pressures increased, and a trend toward employment of nonunion workers developed in the Southern California construction industry.  In 1978, Alondra, which had previously been an inactive corporation, began to conduct insulation sales and installation business using nonunion installation workers, while UCIC continued its insulation sales and installation business using union installation workers.  By operating Alondra and UCIC in this fashion, Mr. Munro implemented the business operating concept of "double-breasting", under which, out of a total business operation, one entity is subject to union contracts, while the other entity is not.  During the middle and late 1980's, Alondra, with its lower labor costs, grew in size, while UCIC experienced a decline in business because of its higher labor costs.[7]

_____

[6](...continued)
This corresponds to annualized growth of 11.43 percent if we take the time until 1986-87 as being 9 years (and 12.94 percent if we take it as being 8 years).  Using the Producer Price Index instead, we get similar figures: $327,604.34 in 1987 dollars; total growth of 205.28 percent, representing 13.20 percent annual growth over 9 years.

[7]The Carpenters' Union, at a date unspecified in the record, filed a lawsuit challenging the structuring of Alondra as a nonunion shop, on the grounds that UCIC and Alondra were one and the same business entity for labor union contract purposes. Eventually, around 1986 or 1987, a settlement was reached with
(continued...)

Role of Pertinax

Mr. Munro, at about the same time that Alondra was activated and as an integral part of the "double-breasting" operating concept, decided to establish Pertinax as a separate entity to provide management, marketing, and administrative services for UCIC and Alondra. On January 4, 1978, Pertinax was organized as an equal partnership of UCIC, Alondra, and Edco. Mr. Clearman became Pertinax's general administrative manager and was so employed continuously through December 1987. Alondra and UCIC used their own separate work forces to carry out their contracts to install insulation. However, Pertinax supplied overall management, marketing, administrative, and financial services for each of the three corporate partners.

Pertinax provided its corporate partners with numerous important advantages, including economies of scale and utilization of the same talents in providing similar services to both UCIC and Alondra, while at the same time preserving their separateness for installation labor purposes. Thus, Pertinax could avoid staff duplications and provide the same services to

---

[7](...continued)
the Carpenters' Union whereby Alondra became a union shop but could remain competitive with nonunion shops. Alondra signed a contract with the Carpenters' Union that allowed piecework pay (which nonunion contractors used), rather than the hourly rate that the union had traditionally demanded. Even after the settlement, management continued to emphasize growth in Alondra, which, as a union shop that could compete with nonunion contractors, had the best of both worlds.

the two insulation businesses whose needs were virtually identical, including the making and implementation of executive policy, accounting, marketing, clerical assistance, personnel work, administration, purchasing (insulation product, supplies, and equipment), insurance, data processing, tax return preparation, and so on. In effect, Pertinax provided, with the exceptions of vehicles and insulation installers and their supervisors, virtually all the services that UCIC, Alondra, and Edco required, including executive personnel. Pertinax's executives, Mr. Munro, James Brewer (Mr. Brewer), and Mr. Clearman, set overall business policies and, together with other managers employed by Pertinax, implemented these business policies.

Another major advantage was that, by using Pertinax as a central purchasing agent, Alondra and UCIC received the benefit of lower prices for insulation materials and other supplies and services through leveraging their purchasing power.

Throughout 1986 and 1987, Alondra required the most services of the three partners. Thus, during this period, Mr. Clearman, as the general administrative manager of Pertinax, spent 75 to 90 percent of his time on Alondra matters, because Alondra's size and growth were continuing to increase in relation to UCIC's.

At the end of each month, Pertinax would add up the costs incurred by each of the three partners for Pertinax services and charge them for those costs, plus a 10-to-11-percent markup.

Pertinax's service revenue thus consisted of reimbursement of its out-of-pocket expenses, plus a markup. To determine the allocation of its charges, Pertinax would survey its employees every 3 or 4 months, asking each of them to allocate his time spent in servicing the three partners. Most of Pertinax's 25 to 30 employees at the El Centro property received the periodic questionnaires. The percentages derived from this survey were used to allocate Pertinax's costs among the three corporate partners. These surveys were conducted regularly, and, if an employee's activities changed from a prior survey, that change was taken into account, and the costs attributable to that employee were reallocated appropriately. Pertinax generated invoices for the charges allocated to each partner, and all of the partners paid Pertinax's invoices on a timely basis. All four entities--UCIC, Alondra, Edco, and Pertinax--maintained separate general ledgers.

During 1987, 41 employees of Pertinax--apart from Mr. Munro--were listed on Pertinax's Payroll Year to Date Report. They performed the following services and/or occupied the following positions: Computer person, accounting, invoicer, executive administrator, receptionist, administrator, accounting in sales department, clerical, invoicing, handling of claims, data processing, supervision of Alondra's production, accounts receivable/collections, sales training, controller, and in-house attorney. Together, they received $982,740 of wages and salaries

from Pertinax in 1987.  When we include Mr. Munro's salary of $500,112, Pertinax's total payroll in 1987 was $1,482,852.

Pertinax's payroll reports record two monthly payments of $41,676 to Mr. Munro during the first half of 1987.  They also indicate that Mr. Clearman and Mr. Brewer received substantial deferred compensation at the beginning of January 1987.

During all of 1987, Pertinax was engaged in the business of providing management services.  No records were kept by Pertinax or any of its general corporate partners that show how many hours per week Mr. Munro or any of its other executives and managers worked for Pertinax.

Uses and Rentals of Real Property

In addition to its headquarters at the El Centro property, Alondra uses four to six other locations as warehouses, including a warehouse on Lilac Avenue, in Rialto, California (the Lilac Avenue property), and UCIC has its own separate warehouse.

The El Centro property, the headquarters of all four entities, consists of an 11,000-square-foot office building situated on about one-half acre of land.  The improvements are owned by Mr. Munro, and the land is owned by his family trust. Mr. Munro has a ground lease with his family trust, so that petitioners and UCIC pay rent only to him and make no separate rent payments to the trust.

The Lilac Avenue property is a 15,000-square-foot warehouse, situated on about 5 acres.  Alondra owns the improvements, and

Mr. Munro's family trust owns the land. Alondra has a written ground lease for the Lilac Avenue property. Every year or two, Mr. Clearman, as Pertinax's general administrative manager, would adjust the amount of rent paid by Alondra for the Lilac Avenue property after calling local realtors for going rental rates on similar properties

UCIC, Alondra, Edco, and Pertinax each have leases with Mr. Munro for their use and occupancy of the El Centro property. These leases are all for terms of 20 years. The lease with Edco is dated November 1, 1978. The lease with Alondra, although undated, also appears to have commenced on November 1, 1978. The lease with Pertinax is dated November 1, 1979. These leases state as initial rental figures $1,000 per month for Alondra, $500 per month for Edco, and $500 per month for Pertinax. Each lease provides for periodic rent adjustments in accordance with the Consumer Price Index, and Mr. Clearman would follow the same procedure in adjusting the rental rate from time to time as he did for the Lilac Avenue property. The rent for the El Centro property would be allocated among UCIC, Alondra, Edco, and Pertinax in accordance with the amount of space each of them used. Mr. Clearman would review and adjust the rent allocations on an annual basis. In general, Alondra's space usage, and thus its share of the rent, increased over the years, whereas UCIC's decreased, and Edco's remained fairly constant. There were no defaults in rental payments by any of the four entities during

any relevant period. Pertinax's rent expense was not charged separately to its three corporate partners, but was absorbed in the 10 to 11 percent markup added to the costs that Pertinax invoiced to the partners. Mr. Munro reported $128,160 in rental income from the El Centro property on his 1987 U.S. Individual Income Tax Return.

Mr. Munro's Working Conditions and Responsibilities

In 1986 and 1987, Mr. Munro had a house in San Marino, California, about 5 miles from the El Centro property. However, he generally lived at another house in Santa Barbara, California, about 75 miles from the El Centro property.

If Mr. Munro was not in the office on a particular business day, a designated executive of Pertinax called him at the end of the day to report on the day's business activities and to obtain operating instructions for the following day or days. Mr. Munro would give specific directions about what should be done regarding current sales, cash management, sales with interesting indications about the current market, and sometimes employee matters. A typical conversation would last between 10 and 30 minutes. In 1986 and 1987, Mr. Brewer coordinated sales activities, carried out Mr. Munro's policy directives governing marketing practices, gross profit margins, how competitive to get with a particular contractor, and so on, and conducted the daily telephone conversations with Mr. Munro. Mr. Munro made the final policy decisions for Pertinax and the other entities, including

cash management, overall marketing, hiring of sales personnel, capital improvements, and equipment purchases, and monitored their overhead costs. Thus, he had ultimate responsibility for them.

Mr. Munro's Compensation Arrangements

Since the 1970's, Attorney William Malis (Mr. Malis) has known Mr. Munro and acted as a business adviser and general legal counsel to UCIC, Alondra, and Edco. At some undisclosed time,[8] Mr. Munro asked Mr. Malis to propose a fair and reasonable compensation package. Mr. Malis looked at the last 4 years' income tax returns for all the corporations and concluded that average gross sales were something less than $5 million. He therefore suggested that Mr. Munro should not be compensated unless sales exceeded that base line and suggested step-percentages above that amount. Further, because of Mr. Munro's alleged expertise and negotiating skills in obtaining price concessions and favorable payment terms from suppliers, Mr. Malis thought that Mr. Munro should receive apparently modest percentages of gross profits, again according to a scale of step-percentages. Based on that reasoning, Mr. Malis drafted the Business Consultant and Management Agreement (the Management Agreement). The original Management Agreement included Alondra

---

[8]This time appears to be close to Jan. 2, 1978, when the agreement about to be described was by its terms to commence. This agreement is undated.

and Edco as signatories and referred to UCIC "and its affiliates".  Although the Management Agreement by its terms made Mr. Munro's compensation as consultant depend on the gross sales and profits of UCIC alone, it was intended that Alondra's and Edco's gross sales and profits should also be taken into account.

Later, about 1983 or 1984, Mr. Malis revised the Management Agreement to address Mr. Munro's concerns about asbestos liability and to make the language of the agreement conform to the previous practice of using the gross sales and profits of all three companies--UCIC, Alondra, and Edco--in computing Mr. Munro's compensation.  Either at the relevant time or thereafter, Mr. Malis calculated what Mr. Munro's compensation should be under the revised Management Agreement by aggregating the gross sales and gross profits of UCIC, Alondra, and Edco.  On that basis, Mr. Munro would have been entitled to $956,905 for 1986 and $1,276,427 for 1987, but he actually received only $596,316 during 1986 and $1,000,112 during 1987.

Mr. Malis observed Mr. Munro's skills in negotiating useful price concessions and payment terms from the primary supplier of insulation materials.  At some time, Mr. Malis calculated that from 1975 through 1993 Mr. Munro had saved UCIC and Alondra a combined amount of at least $6 million in materials costs, and finance charges of approximately $2 million.[9]

---

[9]However, in 1987 alone the savings were no more than
(continued...)

Payments in Issue

In 1987, Pertinax paid Mr. Munro $500,112 in salary and $500,000 as a management fee, and he reported both amounts as income on his Form 1040, U.S. Individual Income Tax Return, for 1987. Pertinax paid rent of $12,834 to Mr. Munro, and he reported that amount on his 1987 individual income tax return.

Alondra paid $900,000 to Pertinax on June 26, 1987. The payment was originally recorded in Account No. 1920, a suspense and clearing account, but a substitute invoice reclassified this expense under Account No. 6395, for management services to the El Centro headquarters for Alondra. The following account numbers were used by Pertinax, Alondra, UCIC, and Edco to classify expenditures in certain expense categories that were paid to Pertinax by Alondra, UCIC, and Edco and deducted as ordinary and necessary business expenses for income tax purposes: Account No. 6395 for management services for the El Centro headquarters office for Alondra; Account No. 5395 for branch management services; and Account No. 6055 for general administration wages for the El Centro headquarters.

In addition to the $900,000 payment to Pertinax, Alondra has documented further payments to Pertinax during Alondra's fiscal

_____

[9](...continued)
slightly in excess of $714,246 in materials costs and $226,178 in finance charges. Moreover, if we subtract the figures for 1988 and subsequent years, the savings allegedly achieved by Mr. Munro over the period from 1975 through 1987 do not exceed $3,683,409 in materials costs and $1,166,412 in finance charges.

1987 for wages and management services amounting to $1,231,127.[10] Because we do not know how much of the $225,203 claimed by Alondra as a rent deduction is supposed to have been paid to third parties, we cannot determine the exact relationship of this amount to the rental income that Mr. Munro reported as such in his 1987 individual income tax return. However, Mr. Munro's reporting of rental income appears consistent with the rental payments that petitioners claimed as deductions.

Edco has documented payments of $37,658 to Pertinax during Edco's fiscal 1987 for wages and management services. Mr. Munro appears to have included the $7,200 claimed by Edco as a rent deduction in the rental income that he reported in his 1987 individual income tax return as rental income.

Pertinax, in its U.S. Partnership Return of Income for 1987, reported as gross income $2,649,859 in management fees. It deducted $1,655,942 for salaries and wages and $500,000 for "management". Respondent, having determined that reasonable compensation for Mr. Munro was $142,823, disallowed the $500,000 management deduction and $357,289 of the deduction for salaries and wages claimed by Pertinax.

---

[10]Respondent concedes that petitioners have documented $1,198,407 through one exhibit and an additional $32,450 through another pair of exhibits. In fact, however, the first of these exhibits, by our calculation, documents $1,198,677. As a result, the total documented is $1,231,127, not $1,230,857, as respondent calculates.

OPINION

The disputes in these consolidated cases primarily concern the deductibility of: (1) Payments by corporate petitioners Alondra and Edco, which generally went to partnership petitioner Pertinax and which it included in gross income on its Form 1065;[11] and (2) payments by Pertinax, most notably of compensation and rent to Mr. Munro.

This state of affairs creates a danger of double taxation to corporate petitioners to the extent that they are disallowed deductions for payments to Pertinax at level (1). This is because disallowing deductions to Pertinax at level (2) for payments that originated in receipts from corporate petitioners that are also disallowed as deductions to them at level (1) will cause amounts disallowed to Pertinax to come back to corporate petitioners as distributive shares of partnership income at level (1).

In what follows, we will avoid double taxation by treating Pertinax as a conduit so that the unreasonable compensation routed from the corporate partners to Mr. Munro through Pertinax will be regarded for tax purposes as received by Mr. Munro from the corporate partners. We leave the calculations of the amounts of the necessary adjustments to the Rule 155 computations. See discussion infra Issue 6.

---

[11]However, rental payments by Alondra, Edco, and Pertinax went directly to Mr. Munro.

Issue 1.  Motion To Shift Burden of Proof

Just before trial, corporate petitioners, invoking Rule 142(a), filed a Motion to Shift the Burden of Proof Upon Respondent with regard to substantiation of the following categories of disallowed amounts paid by Alondra and Edco:  Those paid as rent to Mr. Munro (discussed infra Issue 2); those paid to Pertinax under the rubric of Management Services--Other (discussed infra Issue 4); and those paid to Pertinax under the rubric of Management Services--Wages (discussed infra Issue 5). We postponed acting on the motion and left it for disposition as part of our opinion on the merits.

Petitioners argue and respondent denies that the language of the deficiency notices implies that the payments now questioned by respondent were in fact made.  As an example, we quote the language of the notice sent to Alondra on March 8, 1991.  With respect to the rental expenses, this notice states:

> It is determined that you incurred rental expense in the amount of $198,322.00 in lieu of the $225,203.00 reported on your return for the taxable year ended June 30, 1987.  The adjustment of $26,881.00, as shown below, results from the partial disallowance of rental expenses paid to Joel Munro, * * * claimed on your return for two properties owned by him * * * because you have not established that the amounts paid were the fair market rental values of the properties at the time of payment, or that the amounts paid were incurred or, if incurred, paid by you during the taxable year for ordinary and necessary business purposes or that these expenses were deductible under the provisions of the Internal Revenue Code. [Emphasis added.]

With respect to management service fees, the notice states:

It is determined that you incurred management service fees of $332,717.00 in lieu of the $1,239,596.00 reported on your return for the tax year ended June 30, 1987. The adjustment of $906,879.00 results from the disallowance of amounts <u>paid by you</u> to Pertinax, Limited * * *, for management services provided to the taxpayer by Pertinax. This adjustment is made because you have failed to establish that <u>the amounts paid</u> were incurred, or if incurred, were paid by you during the taxable year for ordinary and necessary business purposes; or that actual management services were provided for the fees paid. [Emphasis added.]

Finally, with respect to wage expenses, the notice states:

It is determined that you incurred wage expense on your tax return of $687,167.00 in lieu of the $1,571,315.00 reported on your return for the tax year ended June 30, 1987. The adjustment of $884,148.00 results from the disallowance of amounts <u>paid by you</u> to Pertinax, Limited * * *, and deducted by you as reimbursement for the wages paid to the officers of this corporation who were classified as employees of Pertinax, Limited. This adjustment is made because you have failed to establish that <u>the amounts paid</u> were incurred, or if incurred, were paid by you during the taxable year for ordinary and necessary business purposes, or that the individuals classified as employees of Pertinax were not, in fact, employees of this taxpayer corporation under the provisions of the Internal Revenue Code. [Emphasis added.]

The notice to Edco contains substantially identical language.

Respondent's answers, filed on July 11 and July 26, 1991, implicitly not only deny that these three categories of payment were fair and reasonable, but also that they were even incurred. Respondent's trial memoranda for the Alondra and Edco cases made clear that respondent was going to require petitioners to establish that the three categories of expenditures had been paid or incurred. Corporate petitioners' motion argues that substantiation of the payments was a new matter not mentioned in

the statutory notices.  Corporate petitioners have always seen the substantiation issue as concerning substantiation of payment. At trial, documents were stipulated that substantiate the challenged management payments.  Indeed, respondent, except for some small matters of detail, essentially failed at trial to dispute the substantiation issue.  However, respondent on brief not only continues to deny that the payments to Pertinax for management services and to Mr. Munro for rent have been substantiated, but now argues that Alondra and Edco were required to and failed to substantiate their total deductions for wages and management services.

Insofar as the issue is substantiation of payment, corporate petitioners' motion is moot.  Respondent's belated demand for substantiation of Alondra's total deductions for wages is unacceptable.  In the period in question, Alondra had between 175 and 200 employees.[12]  Before briefing, respondent had challenged only payments to Pertinax and Mr. Munro.  There was no reason for Alondra to anticipate that it would have to substantiate wages paid to its own employees.  Inasmuch as this matter was not even argued until briefing, we consider it not to be before the Court. Generally, we will not consider issues that are raised for the first time at trial or on brief.  <u>Foil v. Commissioner</u>, 92 T.C.

---

[12]We do not discuss here Edco's three employees, because respondent's notice disallowed all of Edco's $35,671 deduction for wages and salaries.

376, 418 (1989), affd. 920 F.2d 1196 (5th Cir. 1990); <u>Markwardt</u> <u>v. Commissioner</u>, 64 T.C. 989, 997 (1975). In what follows, we consider Alondra and Edco wage expense deductions only insofar as they were either actually or allegedly paid to Pertinax as reimbursement for wages paid by Pertinax to its employees.

The record suggests but does not state that corporate petitioners paid fees for management services only to Pertinax. If any such fees were paid to other parties, substantiation of such payments would also be a matter not before the Court. In any event, insofar as payments by Alondra to Pertinax for management services, and to Mr. Munro for rent, require substantiation, we find that they have been substantiated in the record, regardless of which party is deemed to have the burden of proof. Accordingly, we deny as moot corporate petitioners' motion to shift the burden to respondent with respect to wage and salary payments by Alondra.

For Edco, respondent disallowed all deductions for wages and management services in her statutory notice. Respondent admits that, of the total claimed deductions for management services and management wages of $45,593, petitioner Edco has substantiated payments of $37,657.64. We need only consider who has the burden of substantiating payment of the remaining $7,935.36 if we decide <u>infra</u> that reasonable payment by Edco to Pertinax exceeded $37,657.64. Inasmuch as we do not so find, there is no need for further substantiation of payment of any of Edco's claimed

deduction for management services and management wages, and the only remaining payment by Edco for which we must consider substantiation is the entire $7,200 paid in rent to Mr. Munro, for which respondent now demands substantiation. The record supports the conclusion that this amount was paid.[13]

For Alondra, the record similarly supports the conclusion that as much of the entire rental expense of $225,203 for which Alondra claimed a deduction as was supposed to have been paid to Mr. Munro was indeed paid to him.[14] Moreover, the substantiated amount that Alondra paid Pertinax during Alondra's fiscal 1987, namely, $2,131,127 ($900,000 + $1,231,127) exceeds $2,123,744, the sum of the originally challenged $884,148 representing reimbursement of wages paid by Pertinax, plus the total of $1,239,596 deducted by Alondra as ordinary and necessary expenses for management services.

Inasmuch as payment of the challenged amounts is either adequately supported by the record or need not be considered by us for other reasons, corporate petitioners' motion is moot, and we therefore deny it.[15]

---

[13]Mr. Munro appears to have reported as rental income in his 1987 individual income tax return amounts comparable to those allegedly paid by the entities and claimed by them as deductions. Mr. Clearman's testimony at trial supports the conclusion that the rent payments were made.

[14]See supra p. 21.

[15]However, in our view the language of the statutory notices

(continued...)

Having disposed of the parties' dispute over the burden of proof with respect to the substantiation of payments, we preface the following discussion with the observation that petitioners have the burden of showing that their payments for rent and management services were ordinary and necessary business expenses deductible under section 162.  Rule 142(a).

Issue 2.  Rental Payments

Section 162 provides, in pertinent part:

> SEC. 162(a).  In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including--
>
> *    *    *    *    *    *    *
>
> (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

Excessive rental payments do not constitute ordinary and necessary business expenses and are therefore not deductible. Foyt v. United States, 561 F.2d 599, 603 (5th Cir. 1977). Payments in excess of reasonable rent pursuant to an agreement between closely related parties that is not the product of arm's-length negotiation are not "required" within the meaning of

---

[15](...continued) does reflect the assumption that the challenged amounts were paid, and Fleming v. Commissioner, T.C. Memo. 1985-165, would provide adequate support for granting corporate petitioners' motion (to the extent that it concerns substantiation of payment) if it had not been mooted.

section 162(a)(3) and may therefore be rendered nondeductible. Sparks Nugget, Inc. v. Commissioner, 458 F.2d 631, 634 (9th Cir. 1972), affg. T.C. Memo. 1970-74; Hyde v. Commissioner, T.C. Memo. 1974-103. In the absence of arm's-length negotiations, determination of what is a reasonable rental requires an inquiry into whether the amount paid exceeds what a lessee dealing at arm's length with a stranger would have been required to pay. Peck v. Commissioner, 904 F.2d 525, 528 (9th Cir. 1990), affg. 90 T.C. 162 (1988); Sparks Nugget, Inc. v. Commissioner, supra at 635. The taxpayer has the burden of rebutting the Commissioner's determination, initially entitled to a presumption of correctness, that rental payments are unreasonable, even when the Commissioner has disallowed them in their entirety. Audano v. United States, 428 F.2d 251, 257 (5th Cir. 1970).

Here, petitioners have not carried that burden, particularly since respondent has disallowed only a relatively small part of their rental payments: $33,738 out of a total of $245,237 claimed as deductions by all three petitioners, leaving a total deduction of $211,499 not in dispute. Mr. Clearman testified that the rent for both the Lilac Avenue and the El Centro properties was determined every 1 to 2 years by calling a local realtor and inquiring into the prevailing rents for similar properties. However, this was the only evidence offered by petitioners to support the conclusion that the rents were fair and reasonable. We are not satisfied that the rents were

established by arm's-length negotiations among these closely related parties. The leases for the El Centro property make adjustments in rent dependent on the Consumer Price Index. The total in monthly rents paid by Alondra, Edco, and Pertinax, according to the 1978-79 leases, of $2,000 per month in 1978, adjusted for the Consumer Price Index, corresponds to $41,782 per annum in 1987, but in that year Mr. Munro received $128,160 in rental income from that property. A variation in the rents paid by UCIC and/or UCII between those years cannot explain the discrepancy. In any case, petitioners have not established that the initial lease terms for the El Centro property were reasonable. The lease for the Lilac Avenue property is not in the record.

Under these circumstances, we will not overturn respondent's determinations with respect to rental payments.

Issue 3. Mr. Munro's Compensation From Pertinax

Section 162(a)(1) allows a partnership, like any other business, to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered" as an ordinary and necessary business expense. Salary arrangements between closely held corporations and their shareholders warrant close scrutiny, Spicer Accounting, Inc. v. United States, 918 F.2d 90, 92 (9th Cir. 1990); Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1324 (5th Cir. 1987), affg. T.C. Memo. 1985-267, and the same holds true for payments among

related entities that include a partnership, <u>Velvet Horn, Inc. v. Commissioner</u>, T.C. Memo. 1981-227 (rental payments from controlled corporation to controlled partnership). To be deductible under section 162(a)(1), compensation must be both: (1) Reasonable and (2) paid "purely for services" rendered to the business. Sec. 1.162-7(a), Income Tax Regs.

According to section 1.162-7(a), Income Tax Regs., any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. Sec. 1.162-7(b)(1), Income Tax Regs. In addition, contingent compensation invites close scrutiny as a possible distribution of earnings of the enterprise. Sec. 1.162-7(b)(2), Income Tax Regs. If a contingent compensation arrangement turns out to generate payments greater than the amounts that would ordinarily be paid as compensation, those payments are generally deductible only if they are paid pursuant to a free bargain between the employer and the individual made before the services are rendered and not influenced by any consideration on the part of the employer other than that of securing the services of the individual on fair and advantageous terms. <u>Id.</u> Finally, the allowance for the compensation may not exceed what is reasonable under all the circumstances. Sec. 1.162-7(b)(3), Income Tax Regs.

Bonuses paid to employees are deductible only when made in good faith and as additional compensation for services actually rendered by the employees, provided that when added to the

salaries, they do not exceed reasonable compensation for the services rendered. Rapco, Inc. v. Commissioner, T.C. Memo. 1995-128; sec. 1.162-9, Income Tax Regs.

Extraordinary, unusual, and extravagant amounts paid by a corporation to its officers as purported compensation for their services, but having no substantial relation to the measure of their services and being disproportionate to their value, are not in reality payments for services; they are not regarded as "ordinary and necessary expenses" within the meaning of section 162(a)(1) merely because the payments are made in accordance with an agreement between the corporation and its officers. Botany Worsted Mills v. United States, 278 U.S. 282, 292 (1929).

Contingent compensation agreements can be upheld and compensation paid under them held to be deductible under appropriate circumstances. Automotive Inv. Dev., Inc. v. Commissioner, T.C. Memo. 1993-298; North Carolina Equip. Co. v. Commissioner, a Memorandum Opinion of this Court dated June 4, 1945. However, we expressly stated in Automotive Inv. Dev., Inc. v. Commissioner, supra, that even the contingent compensation formula there approved might in other circumstances result in compensation that is unreasonable under section 162(a)(1). Compensation, even under a contingent compensation formula, is in any case limited to what is reasonable under all the circumstances, which is in general such amount as would ordinarily be paid for like services by like enterprises under

like circumstances. Sec. 1.162-7(b)(3), Income Tax Regs. Where there is no free bargain between the parties as contemplated by section 1.162-7(b)(2), Income Tax Regs., a contingent compensation agreement will not be dispositive of what is deductible under section 162(a)(1). Pepsi-Cola Bottling Co. v. Commissioner, 528 F.2d 176, 181-183 (10th Cir. 1975), affg. 61 T.C. 564 (1974); Hammond Lead Prods., Inc. v. Commissioner, 425 F.2d 31, 33 (7th Cir. 1970), affg. T.C. Memo. 1969-14. The court in such a case is free to make its own determination of what is reasonable compensation.

Whether an expenditure that is claimed as a deduction under section 162(a)(1) is reasonable compensation for services rendered is a question of fact that must be decided on the basis of the facts and circumstances. Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992); Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1058-1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973). The burden is on petitioners to show that they are entitled to a compensation deduction larger than that allowed by respondent. Rule 142(a); Owensby & Kritikos, Inc. v. Commissioner, supra at 1324; Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 361 (9th Cir. 1974), affg. T.C. Memo. 1971-200. Partnerships bear this burden as much as corporations. Huber v. Commissioner, T.C. Memo. 1984-593.

The cases contain lengthy lists of factors that bear on the determination of reasonableness.  The Court of Appeals for the Ninth Circuit, to which appeal in these cases would lie, uses the five-factor test of Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1245-1248 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282.  These five factors are:  (a) Role in company; (b) external comparison; (c) character and condition of company; (d) conflict of interest; and (e) internal consistency.  Id.; L & B Pipe & Supply Co. v. Commissioner, T.C. Memo. 1994-187; Curtis v. Commissioner, T.C. Memo. 1994-15.  No single factor is controlling.  Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7.

(a) Role in Company

Relevant considerations include the position held by the employee, hours worked, duties performed, and the general importance of the employee to the success of the enterprise.  If the employee has received a large salary increase, it may be helpful to compare past and present duties and salary payments.  Elliotts, Inc. v. Commissioner, supra at 1245.  Even though respondent now disputes that Mr. Munro was chief executive officer of petitioners, including Pertinax, both parties have treated him as such, and the record is replete with evidence that he was ultimately responsible for petitioners' policy decisions.  Although Mr. Munro had been responsible for obtaining favorable terms with suppliers in prior years, nothing in the record

indicates that he actually did so in 1986-87.  The record does not indicate that Mr. Munro devoted any more than minimal time to petitioners' affairs during the years in question.  Moreover, the record indicates a sharp rise in Mr. Munro's compensation for 1987 without any concomitant growth of the associated enterprises.

This factor supports allowing a deduction for payments to Mr. Munro of no more than the normal pay of a chief executive officer in the industry.

(b) External Comparison

This factor requires a comparison of the employee's compensation with that paid by similar companies for similar services.  Elliotts, Inc. v. Commissioner, supra at 1246.  Courts often regard this as the most important factor and receive testimony on the subject from competing experts.  In these cases, however, we have only the testimony of respondent's expert, E. James Brennan III (Mr. Brennan).  As we have previously noted, Mr. Brennan is no stranger to this Court in that capacity.  Mad Auto Wrecking, Inc. v. Commissioner, T.C. Memo. 1995-153.  The method that Mr. Brennan has used to try to determine reasonable compensation for Mr. Munro is similar to Mr. Brennan's method in other recent cases.  Mr. Brennan uses data published in executive compensation surveys to derive equations relating total revenues of a business to the compensation paid to  its officers.

Mr. Brennan concluded in his report that the highest maximum amount of total compensation that the top executive of Pertinax should have received was $213,470. This figure was derived from the data reported by Executive Compensation Service for Industry Sector: Services (Bonus Paying Companies) for 1988 and took into account Pertinax's reported revenues. Since the value of Mr. Munro's and Pertinax's services depended on the extent to which they helped corporate petitioners' businesses, and not on the gross revenues of Pertinax from the corporate partners, it was a clear error for Mr. Brennan to use Pertinax's revenues. In his testimony at trial Mr. Brennan used the revenues of Alondra, UCIC, and Edco to reach the conclusion that maximum reasonable compensation for Mr. Munro should have been $400,000 if he was "the best of the best" among chief executive officers and $300,000[16] if he was merely average.

As in previous cases, we have difficulty accepting Mr. Brennan's methods and conclusions. Guy Schoenecker, Inc. v. Commissioner, T.C. Memo. 1995-539; Mad Auto Wrecking, Inc. v. Commissioner, supra; BOCA Constr., Inc. v. Commissioner, T.C. Memo. 1995-5; L & B Pipe & Supply, Inc. v. Commissioner, supra; Mortex Manufacturing Co., Inc. v. Commissioner, T.C. Memo. 1994-110; Curtis v. Commissioner, supra; Automotive Inv. Dev., Inc. v.

---

[16]Mr. Brennan spoke of one standard deviation's distance from the mean, but respondent rightly uses Mr. Brennan's equations and data to interpret this to mean $300,000.

Commissioner, T.C. Memo. 1993-298; Diverse Indus., Inc. v. Commissioner, T.C. Memo. 1986-84; Owensby & Kritikos, Inc. v. Commissioner, T.C. Memo. 1985-267.  Probably the greatest flaw in his methods, as we have often stated, is that he does not base his conclusions on comparable businesses:  perhaps it would have been too difficult to get information about insulation contractors in particular, but industry services--as opposed to, say, building contractors--is far too broad.  In addition, we note that the method presents a serious risk of bias:  the data come from 643 out of 2,737 U.S. companies that chose to reply to questionnaires.  Mr. Brennan's method purports to depend on the highest compensation actually paid by other businesses, but Executive Compensation Service, in producing its reports, excludes "outliers" that cannot be explained by its equations.[17]

Despite our difficulties with Mr. Brennan's methods, we note that respondent continues to rely on Mr. Brennan to argue that Mr. Munro was not entitled to compensation exceeding $300,000, or, if we conclude that he rendered exceptional service as a chief executive officer, $400,000.  We agree with respondent that Mr. Munro was not a truly superlative chief executive officer in

---

[17]We have trouble understanding the significance of Mr. Brennan's use of "standard deviations" in this context.  He admitted that his data are asymmetrical and do not display the percentage of outliers at distances of more than one or two standard deviations from the mean that one would expect from a bell-shaped curve; i.e., that the distribution of the population is not normal.

1986-87.  However, we will use Mr. Brennan's conclusions only against respondent, as a tacit concession that Mr. Munro was entitled to be paid $300,000.  Cf. Guy Schoenecker, Inc. v. Commissioner, supra.

Thus, this factor favors petitioners, but only to the extent described above.

### (c) Character and Condition of Company

The focus here is on the company's size as indicated by its sales, net income, or capital value, and on the complexities of the business and general economic conditions.  Elliotts, Inc. v. Commissioner, 716 F.2d at 1246.

The parties agree that Alondra and UCIC were operating at a profit in 1987 but showed no particularly great growth.  However, petitioners argue that Mr. Munro should have been credited with and compensated for petitioners' allegedly great growth in previous years and point to Allison Corp. v. Commissioner, T.C. Memo. 1977-166, where deferred compensation for earlier years' work was allowed.

Under certain circumstances, prior services may be compensated in a later year.  Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119-120 (1930); American Foundry v. Commissioner, 59 T.C. 231, 239 (1972), affd. in part and revd. in part on other grounds 536 F.2d 289 (9th Cir. 1976).  However, the taxpayer must establish that compensation in the prior periods was insufficient and that the current year's compensation was intended to

compensate for the prior underpayments.  Estate of Wallace v. Commissioner, 95 T.C. 525, 553-554 (1990), affd. on another ground 965 F.2d 1038 (11th Cir. 1992).

As we have seen supra note 6, earlier growth was not so extraordinary.  In any case, Mr. Munro was highly compensated in earlier years,[18] so no reason was shown to reward him in 1986-1987 for what he had done earlier.  Moreover, there is nothing in the record to indicate that any of the compensation paid to Mr. Munro in 1987 was earmarked as being for prior services; the absence of any earmarking supports the view that petitioners' argument in this regard is a mere afterthought. Pacific Grains, Inc. v. Commissioner, 399 F.2d at 606.

On balance, this factor supports upholding normal chief executive officer compensation for the current year for Mr. Munro.

(d) Conflict of Interest

This fourth factor focuses on whether a relationship exists between petitioners and the employee (here Mr. Munro) that might permit them to disguise nondeductible corporate distributions of income as deductible salary expenditures.  Such a relationship may exist where the employee is a business's sole or controlling

---

[18]In 1986, the salary income reported on Mr. and Mrs. Munro's joint income tax return was $596,316.  We have no evidence for 1984 and 1985.  In 1983, Mr. Munro's salary was $309,504.  In 1982, it was $231,500.  In 1979, 1980, and 1981, it was $240,000.

shareholder, or where the existence of a family relationship indicates that the terms of the compensation arrangement may not have been the result of a free bargain. Elliotts, Inc. v. Commissioner, supra at 1246-1247.

The record clearly discloses a family relationship. Alondra's sole shareholder was Mr. Munro's daughter Ms. Ross. The sole shareholder of UCII (the sole owner of UCIC) and of Edco was Mr. Munro himself. Thus, Mr. Munro was the sole owner of two out of the three equal partners of Pertinax, and the third partner was wholly owned by his daughter. Petitioners themselves argue strenuously, in support of their claim that Mr. Munro did important work deserving generous compensation, that he effectively controlled all the entities. There is nothing in the record besides Mr. Malis' less than credible testimony to indicate that anything like arm's-length negotiations took place.

The cases at hand bear a striking resemblance to Pepsi-Cola Bottling Co. v. Commissioner, 61 T.C. at 568-569. In that case, the contingent compensation agreement under review had been struck years before. During its earlier years, the arrangement resulted in far less compensation to the executive in question than he later received. Moreover, he long had been the sole executive officer of the corporation that paid the compensation. We concluded that the contingent compensation agreement was not the result of a free bargain, so that it did not have to be

honored under section 1.162-7(b)(2), Income Tax Regs. Here too, there was no such free bargain.[19]

As petitioners concede, this factor favors respondent.

(e) Internal Consistency

This factor requires comparison with how other employees in the business were paid compared to the employee in question and with how the employee himself was paid in other years. Elliotts, Inc. v. Commissioner, supra at 1247-1248.

In these cases, for purposes of comparing salaries of other employees with Mr. Munro's compensation, we have information only for 1987. In that year, $500,112 out of Mr. Munro's total compensation of $1,000,112 was wages and salary, whereas the wages and salary of petitioners' other two primary executives, Mr. Brewer and Mr. Clearman, were $191,748 and $78,000, respectively.

Although Mr. Munro's compensation in previous years had been substantial, the management fee or bonus of $500,000 for 1987 was, as far as we know, unprecedented in the history of Pertinax and its partners.

Petitioners concede that this factor also favors respondent.

---

[19]We need not take into account either version of the Management Agreement, both because there was no free bargain and because the record indicates that neither version was actually given effect by the parties. Thus, we need not discuss the parties' arguments about whether the Management Agreements were enforceable under California contract law.

We conclude that on balance all the factors favor allowing only as much deductible compensation for Mr. Munro as Mr. Brennan and respondent have conceded is reasonable. We therefore hold that Pertinax was entitled to deduct $300,000 for compensation paid to Mr. Munro, but no more. Cf. <u>Guy Schoenecker, Inc. v. Commissioner</u>, T.C. Memo. 1995-539. We thus sustain a disallowance of $700,112 in the deduction claimed by Pertinax for compensation payments to Mr. Munro.

<u>Issue 4. Management Service Fees Paid by Alondra and Edco</u>

We have held that businesses can deduct management and consulting fees under section 162(a)(1) only to the extent that they were paid for services actually rendered. <u>Huber v. Commissioner</u>, T.C. Memo. 1984-593. What matters is the nature of the services performed, and not the label put on them by the payor and the payee. <u>Id.</u> Petitioners bear the burden of proving what portion of the fees is allocable to deductible expenses. <u>Id.</u>

In these cases, petitioners have established that Pertinax performed management services for the corporate partners. However, they have not carried their burden of establishing the extent to which the total of $1,249,518 alleged to have been paid to Pertinax by corporate petitioners was in payment for such services. The bulk of the $906,879 disallowed to Alondra by respondent might well be presumed to consist of the $900,000 challenged by respondent. Aside from a bare statement that the

$900,000 was "reimbursement of salaries and compensation paid by and/or incurred for Pertinax to its employees, including James Brewer, David Clearman, Joel Munro, and others", petitioners have pointed to no evidence establishing the purpose of the payment. Certainly, the circumstances surrounding the substitute invoice create suspicion. Moreover, petitioners have not provided the information that would enable us to determine the value of the services provided by Pertinax--particularly Mr. Munro's services--to the corporate partners.

Respondent, in her trial memorandum in the Alondra case, docket No. 10849-91, states that $900,000 of the $906,879 disallowed to Alondra was used for "mgmt. fees (bonuses)".[20] This statement strongly suggests that this amount includes the $500,000 paid as a management fee to Mr. Munro. Even though petitioners, who bear the burden of disproving respondent's determination, Rule 142(a), have not even moved to have the trial memorandum entered into the record,[21] we admit respondent's

---

[20]The remaining $6,879 is said in that memorandum to have been paid for "mgmt. services (wages) for Mirror Products". Mirror Products is not identified in the record, but respondent's treatment of the amount suggests it is controlled somehow by Mr. Munro.

[21]The relevant information in the trial memorandum was available to both parties. As we stated in Sisson v. Commissioner, T.C. Memo. 1994-545, the evidentiary rule of Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. on other grounds 162 F.2d 513 (10th Cir. 1947) (failure of a party to produce evidence in his possession that might favor his case leads to the presumption that the evidence
(continued...)

statement sua sponte as an admission, Fed. R. Evid. 801(d)(2).
We conclude from this evidence that upholding respondent's
disallowances at both the Pertinax and corporate petitioner
levels would, absent some offsetting adjustment, result in
substantial double taxation of corporate petitioner Alondra.  See
introductory discussion supra pp. 21-22.  Nevertheless,
petitioners have failed to refute respondent's disallowances of
deductions of $906,879 by Alondra and of $9,922 by Edco under
this heading.  We therefore sustain respondent's disallowances of
all of Edco's $9,922 deduction and $906,879 of Alondra's
$1,239,596 deduction.  However, we deal infra Issue 6 with the
double taxation issue generated by respondent's determinations
and our rulings on Issues 3, 4, and 5.

Issue 5.  Management Wages

Respondent's statutory notice appears to have disallowed as
much of Alondra's total deduction of $1,571,315 for wages and
salaries as went to Pertinax--$884,148--and all of Edco's

---

[21](...continued)
is in fact unfavorable), therefore cannot be used against either
party.

Respondent urges us to use Wichita Terminal against
petitioners because of Mr. Munro's failure to testify at trial.
Petitioners' counsel's assertion of Mr. Munro's bad health was,
however, an adequate explanation of his absence, particularly in
view of his advanced age at the time of trial.  In any event,
respondent was just as free as or even more free than petitioners
to call Mr. Munro as a witness.  We therefore consider Mr.
Munro's absence to be a neutral factor.

deduction of $35,671 for wages and salaries.  However, the record shows that Pertinax paid wages and salaries amounting to $982,740 to 41 employees other than Mr. Munro, and the numbers for those employees are reasonable.[22]  In addition, we have just held that reasonable compensation for Pertinax to pay Mr. Munro was $300,000.  These figures add up to $1,282,740.

We do not know the relative shares of this total paid by Alondra, UCIC, and Edco.[23]  However, we conclude, using the rule of <u>Cohan v. Commissioner</u>, 39 F.2d 540, 544 (2d Cir. 1930), and the sales figures available for 1987, that of this $1,282,740, UCIC paid $412,016, Alondra $838,448, and Edco $32,276.

With respect to Edco, we note that respondent has disallowed all of Edco's $35,671 deduction for salaries and wages, even though the parties have stipulated that Edco had three employees. Even though the stipulation does not say whether or not they were full time, or represented an allocation between Edco and the other corporate partners, this determination is obviously wrong. We uphold Edco's $35,671 deduction in full.

Of the $884,148 that Alondra apparently paid to Pertinax for wages, we uphold $838,448 and disallow the remaining $45,700.

---

[22]If we divide this figure of $982,740 by 41, the number of Pertinax's employees other than Mr. Munro, we reach an average annual compensation of $23,969.  When we take into account that this figure includes the executive salaries for Messrs. Clearman and Brewer, this average looks eminently reasonable.

[23]The statutory notice sent to UCII disallowed $294,408, apparently UCII's total deduction for management fees--wages for 1987.

This means that of the total $1,571,315 that Alondra deducted for wages, we uphold respondent's disallowance to the extent of $45,700 and uphold Alondra's deduction of the remaining $1,525,615.  This $1,525,615 includes both the $838,448 that we have just calculated, and the initially unchallenged figure of $687,167, which was presumably paid to Alondra's own employees. The $45,700 we disallow represents the part of Alondra's claimed deduction for wages and salaries that we are not satisfied was used by either Alondra or Pertinax to pay reasonable compensation.

Our results to this point may be tabulated as follows:

### Deductions

| | Claimed | Allowed Stat. Notice | Allowed Tax Ct. | Disallowed Tax Ct. |
|---|---|---|---|---|
| **Rents (Issue 2)** | | | | |
| Alondra | $225,203 | $198,322 | $198,322 | $26,881 |
| Edco | 7,200 | 3,479 | 3,479 | 3,721 |
| Pertinax | 12,834 | 9,698 | 9,698 | 3,136 |
| **Management Services/Other (Issues 4, 3)** | | | | |
| Alondra | 1,239,596 | 332,717 | 332,717 | 906,879 |
| Edco | 9,922 | 0 | 0 | 9,922 |
| Pertinax | 2,603,623 | 2,103,623 | 2,103,623 | 500,000 |
| **Wages & Salaries (Issues 5, 3)** | | | | |
| Alondra | 1,571,315 | 687,167 | 1,525,615 | 45,700 |
| Edco | 35,671 | 0 | 35,671 | 0 |
| Pertinax | 1,655,942 | 1,298,653 | 1,455,830 | 200,112 |

It should be noted that, although we have disallowed $700,112 in deductions claimed by Pertinax in the last two categories as representing the unreasonable part of Mr. Munro's

compensation, we have disallowed deductions in these categories of $954,879 for Alondra and $9,922 for Edco. There is no reason why the figures should be identical at both levels. The disallowances to Alondra and Edco at the corporate partner level result partly from a failure of proof by petitioners. Because we have used our determination of Mr. Munro's reasonable level of compensation to reach our results on Issue 5, we must consider it, as well as Issues 3 and 4, when we consider the proper adjustments needed.

Issue 6. Tax Treatment of Disallowed Payments at Two Levels

The strongest reason for upholding respondent's disallowances of the deductions by Alondra and Edco in the management services and wages categories (Issues (4) and (5)) to the extent that we have is that the bulk of those unreasonable payments ended up in Mr. Munro's hands as unreasonable compensation. Our conclusion that the amounts that Pertinax claimed as deductions exceeded what we have determined was Mr. Munro's reasonable level of compensation is of course why we have upheld respondent's disallowance of Pertinax's deductions in these categories to the substantial extent that we have (Issue 3).

The record in its present state makes it difficult to trace precisely how Pertinax used payments coming from the corporate partners, including the payments for which we have disallowed deductions by Alondra and Edco. However, the record, once we

include respondent's trial memorandum, which we have admitted sua sponte, permits us to conclude that the bulk of the disallowed payments made by the corporate partners to Pertinax was used by Pertinax to make payments to Mr. Munro that exceeded reasonable compensation. The record also discloses considerable payments by Alondra and Edco to Pertinax during their taxable years in question.

Unless we treat Pertinax as a mere conduit, our upholding of respondent's disallowances of deductions for the same unreasonable compensation at both the partnership and the corporate partner levels will give respondent two bites of the apple. If we disallow the deductions at the partnership level, having also disallowed deductions for the same payments at the corporate level, then under the rules of TEFRA (Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 648) and section 6226 respondent will be able--and indeed obliged--to treat as income to the partners the payments by them, Munro v. Commissioner, 92 T.C. 71, 74 (1989), that had also been disallowed as deductions to them at the corporate level.

At trial, we asked the parties to address in their briefs the consequence of denying the deductions claimed by Pertinax for compensation paid to Mr. Munro that had, in effect, been received by Pertinax from its partners and reported by Pertinax as gross income. It appeared to us then, as it does now, that disallowing

deductions to the corporate partners for amounts included in distributable income of the partnership would result in doubly taxed income. To the extent that the funds were merely transferred through Pertinax to Mr. Munro, Pertinax did not actually receive gross income that should properly increase partnership income distributable to its partners.

Neither party complied with our request. Because of the difficulty in tracing that we have mentioned, it is possible that some of those amounts may have been reported in years not before us.[24] Nevertheless, we believe that the bulk of the disallowed payments made by the corporate partners to Pertinax was used by Pertinax to make payments to Mr. Munro that exceeded reasonable compensation during the years before us. We will give petitioners a last opportunity, during the Rule 155 computation, to establish the mathematical computations and corrections necessary to avoid this problem. See The Home Group, Inc. v.

_____

[24]We realize that the double taxation we are concerned about would occur in two different taxable years of the corporate petitioners. The disallowance of the payments made to Pertinax by Alondra and Edco occurs during their fiscal years ending June 30 and Sept. 30, 1987, respectively. The Pertinax income on which they would be taxed as a result of the Pertinax disallowance of deductions would be taxed to them in their immediately following fiscal years ending June 30 and Sept. 30, 1988, respectively. This is because Pertinax is on a calendar year, consistently with the limitations of sec. 706(b), and its partners include within their income for a taxable year of theirs any sec. 702 distributive share taxable income with respect to a partnership for any taxable year of the partnership ending within or with the taxable year of the partner. Sec. 706(a). However, the fact that the corporate petitioners would not be taxed on their distributive shares of the phantom income before us here until their following tax year, which is not before us, would not obviate the double taxation danger we see here.

_Commissioner_, 91 T.C. 265, 268-271 (1988), affd. on other issues 875 F.2d 377 (2d Cir. 1989).

We will not perform a similar adjustment for petitioners' rental payments because Pertinax actually used the space that it rented, even if it paid slightly more than respondent determined was reasonable. The evidence does not suggest to us, as it does for the unreasonable compensation, that the parties' intent and the economic substance was for funds to be transferred from the corporate partners to Mr. Munro through the partnership. We are not overly troubled by the small amount of double taxation that may result to the corporate partners from their having to pay tax on their distributive shares of Pertinax's $3,136 rental deduction disallowance.

Issue 7. Additions to Tax

(a) Negligence

Respondent determined that petitioners Alondra and Edco are liable for the additions to tax for negligence pursuant to former section 6653(a)(1)(A) and (B).[25] Section 6653(a)(1)(A) provides an addition to tax for negligence or intentional disregard of rules and regulations in the amount of 5 percent of the underpayment if any part thereof is attributable to negligence. Section 6653(a)(1)(B) imposes an addition to tax in the amount of

[25]Repealed effective for returns whose due date (determined without regard to extensions) is after Dec. 31, 1989. Omnibus Budget Reconciliation Act of 1989 (OBRA 89), Pub. L. 101-239, sec. 7721(c), 103 Stat. 2399. The current provisions for returns due after that date are to be found in current secs. 6662(a), (b)(1), and (c).

50 percent of the interest due on the portion of the underpayment attributable to negligence.

Negligence is defined as the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under similar circumstances. Anderson v. Commissioner, 62 F.3d 1266, 1271 (10th Cir. 1995), affg. T.C. Memo. 1993-607; Norgaard v. Commissioner, 939 F.2d 874, 880 (9th Cir. 1991), affg. in part and revg. in part on other grounds T.C. Memo. 1989-390; Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proving that respondent's determination of negligence is erroneous. Rule 142(a); Allen v. Commissioner, supra at 353; Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

The taxpayer can avoid liability for the addition to tax for negligence by showing that he reasonably relied on competent professional advice. Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217; Weis v. Commissioner, 94 T.C. 473, 487 (1990); Freytag v. Commissioner, 89 T.C. 849, 887-888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). However, "Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered." Freytag v. Commissioner, supra at 888. To succeed in this defense, the taxpayer must show that he supplied all necessary

information to the professional adviser. Weis v. Commissioner, supra at 487; Pessin v. Commissioner, 59 T.C. 473, 489 (1972). When considering the negligence addition, we must evaluate the particular facts of each case, considering the relative sophistication of the taxpayers, as well as the way in which they approached their decisions. Vorsheck v. Commissioner, 933 F.2d 757, 759 (9th Cir. 1991); Levine v. Commissioner, T.C. Memo. 1995-362; Lucas v. Commissioner, T.C. Memo. 1995-341.

In these cases, petitioners contend that their actions were reasonable because they relied upon Mr. Malis, a tax attorney and certified public accountant, in using Pertinax and because the corporate income tax returns were prepared by certified public accountants.

Petitioners have not established that they fully informed the preparers of all information that should have been taken into account in preparing their returns. Mr. Malis did testify that he drafted and revised the Management Agreement, but not that he gave advice on tax matters. Although it must be regarded as highly probable that, as general counsel of the various entities, he offered such advice, the record does not so indicate, and we do not know what his advice was. See Allen v. Commissioner, supra at 354. In any case, and most importantly for our purposes, petitioners cannot be regarded as lacking sophistication, in view of the extensive business experience of

Mr. Munro and Mr. Clearman and the presence of an in-house attorney.

Evaluation of whether, in this setting, petitioners Alondra and Edco were negligent, or intentionally disregarded the rules and regulations, is a factual inquiry. C.T.I. Inc. v. Commissioner, T.C. Memo. 1994-82. Here, Alondra and Edco have not given any credible explanation of what the payments for management services were in fact compensation for. We are particularly struck by the absence of explanation by petitioners for Alondra's $900,000 payment. Under the circumstances, petitioners have not met their burden of showing that they acted reasonably in claiming the deductions whose disallowance we have sustained. Indeed, they have not made such a showing with respect to any such deductions. Consequently, all such underpayments as we find for the corporate petitioners we treat as being attributable to negligence, and the section 6653(a)(1)(A) and (B) additions to tax are imposed on them in their entirety.

(b) Substantial Understatement

Respondent also determined that petitioner Alondra is liable for the addition to tax for substantial understatement of income tax liability pursuant to section 6661(a).[26]

---

[26]Also repealed effective for returns the due date for which (determined without regard to extensions) is after Dec. 31, 1989. OBRA 89 sec. 7721(c), 103 Stat. 2399. The current provisions for returns due after that date are to be found in current secs. 6662(a), (b)(2), and (d).

Former section 6661(a) provides for an addition to tax equal to 25 percent of the amount attributable to a substantial understatement of income tax.  An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000 in the case of a corporation. Sec. 6661(b)(1)(A) and (B).  An understatement of income tax occurs if the tax actually shown on the return is less than the amount required to be shown on the return.  Sec. 6661(b)(2); Woods v. Commissioner, 91 T.C. 88, 95 (1988).  Petitioners bear the burden of proving that respondent's determination is erroneous.  Rule 142(a); Conti v. Commissioner, 39 F.3d 658, 664 (6th Cir. 1994), affg. and remanding 99 T.C. 370 (1992).

Alondra reported total tax due for Alondra's fiscal 1987 of $222,879.  In computing this tax, Alondra claimed deductions for rent, management fees, and wages that respondent disallowed.  In light of our findings on these issues, Alondra's understatement of tax exceeds the threshold established by section 6661.  Thus, Alondra made a substantial understatement within the meaning of section 6661(b).

Petitioners argue, as they do for the negligence additions to tax, that they reasonably relied on competent professional advice.  We reject this argument here as well, just as we do for the negligence additions to tax, and for the same reasons.

An understatement will be reduced to the extent that it is: (1) Based on substantial authority or (2) adequately disclosed in

the return or in a statement attached to the return.  Sec. 6661(b)(2)(B).  In these cases, Alondra's understatement for Alondra's fiscal 1987 was not adequately disclosed.  We cannot say that there was substantial authority for petitioners' tax treatment of the disputed items, even under the liberal standards just enunciated by the Court of Appeals for the Eleventh Circuit in <u>Osteen v. Commissioner</u>, 62 F.3d 356, 359-360 (11th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1993-519.  <u>Osteen</u> can be distinguished from Alondra's case, primarily because the issue here is purely factual.  Nor do we have here the all-or-nothing situation that troubled the Court of Appeals for the Eleventh Circuit in <u>Osteen</u>.

Section 6661(c) provides that the Secretary may waive all or any part of the addition to tax for substantial understatement on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith.  While the authority to waive the section 6661 addition to tax rests with the Commissioner, not with this Court, we review the denial of a waiver by the Commissioner under the abuse of discretion standard.  <u>Mailman v. Commissioner</u>, 91 T.C. 1079, 1084 (1988).[27]

---

[27]Under sec. 6664(c) of current law, OBRA 89 sec. 7721(a), 103 Stat. 2398, effective for returns the due date for which is after Dec. 31, 1989, the Commissioner no longer has this discretion, and no penalty can be imposed for underpayments if it is shown that there was a reasonable cause for them and that the taxpayer acted in good faith, but this is new law, not in effect for the cases before us.

Having found that Alondra has not sustained its burden for the purpose of avoiding the negligence penalty, we would have no difficulty in sustaining the imposition of the substantial understatement penalty, even if Alondra had ever requested a waiver.

In any event, there is no evidence that Alondra has ever requested a waiver. Accordingly, as we noted in Brown v. Commissioner, T.C. Memo. 1992-15, "we cannot find that respondent abused * * * [her] discretion when petitioner never requested respondent to exercise it." See also McCoy Enters., Inc. v. Commissioner, 58 F.3d 557, 563 (10th Cir. 1995), affg. T.C. Memo. 1992-693; Reinke v. Commissioner, 46 F.3d 760, 765-766 (8th Cir. 1995), affg. T.C. Memo. 1993-197; Mailman v. Commissioner, supra at 1082-1084; Dugow v. Commissioner, T.C. Memo. 1993-401, affd. without published opinion 64 F.3d 666 (9th Cir. 1995); Klieger v. Commissioner, T.C. Memo. 1992-734; sec. 1.6661-6, Income Tax Regs.

Respondent's determination of the section 6661 addition to tax is sustained, to the extent of 25 percent of Alondra's understatement of tax.

To reflect the foregoing and the parties' concessions,

Decisions will be entered
under Rule 155.